**DENTON REGIONAL MEDICAL CENTER and Epic Healthcare Group, Inc. Appellants,**

v.

**Lawrence "Butch" LaCROIX, Individually and as Next Friend of Katherine "Kathy" LaCroix, and as Next Friend and Parent of Lawryn LaCroix, Appellees.**

No. 2–95–003–CV.

Court of Appeals of Texas, Fort Worth.

June 26, 1997.

Rehearing Overruled July 31, 1997.

Fowler, Wiles, Norton & Keith, L.L.P., Kevin J. Keith, Dallas, for Appellants.

Michener Larimore Swindle Whitaker Flowers Sawyer Reynolds & Chalk, L.L.P., Jerry K. Sawyer, John Allen Chalk, Fort Worth, for Appellees.

Before CAYCE, C.J., and DAY and DAUPHINOT, JJ.

## OPINION

DAY, Justice.

The main issue we must decide in this medical malpractice case is whether the evidence is legally and factually sufficient to hold a hospital liable for medical negligence under a theory of direct corporate liability, notwithstanding the jury's failure to find that the treating physicians and nurse were negligent. We hold that the evidence is sufficient to support the jury's negligence finding against the hospital. We also hold that Texas law does not permit bystander recovery in medical malpractice cases. Based on these holdings, we affirm the trial court's judgment.

### Factual Background

In the early morning of January 25, 1991, appellees Kathy and Butch LaCroix went to the Women's Pavilion of appellant Denton Regional Medical Center (the hospital) for the birth of their first child, Lawryn. Kathy was admitted to the hospital under the care

of her obstetrician, Dr. John Dulemba. The Women's Pavilion, which opened in 1986, provided 24–hour anesthesia care.

The evidence showed that the practice of anesthesia is a specialized practice of medicine by a physician—an anesthesiologist. An anesthesiologist is also trained in the practice of taking care of a patient just as any other physician is trained. An anesthesiologist is the most highly trained person who practices anesthesia. A certified registered nurse anesthetist (CRNA) is a registered nurse who has additionally completed a two-year study in nurse anesthesia and has been certified by the American Association of Nurse Anesthetists. Nurse anesthetists may administer anesthesia, but only under the medical direction or supervision of a physician. Nurse anesthetists cannot practice medicine.

By virtue of a May 31, 1990 contract with the hospital, Denton Anesthesiology Associates, P.A. (DAA) was the exclusive anesthesia provider for the Women's Pavilion. The contract, which had a term of three years, was a renewal of DAA's prior exclusive contract with the hospital.

In January 1991, DAA consisted of four anesthesiologists, Drs. Christian Green, Darius Pourzan, Zafar Hafiz, and Carlos Garcia, and employed two CRNAs, Don Hill and Carol Blankenship. The contract required DAA to

provide qualified coverage in the Women's Pavilion twenty-four (24) hours per day, seven (7) days per week including weekends and holidays. Qualified coverage is defined as:

(a) An anesthesiologist available to respond to the Women's Pavilion (on-call) within thirty (30) minutes, twenty-four (24) hours a day, seven (7) days a week including weekends and holidays;

(b) Supervision and back-up of all CRNAs employed by [DAA];

(c) A second anesthesia person available within thirty (30) minutes during all elective cases performed in the Women's Pavilion under spinal, epidural, local or general anesthesia. . . .

Thus, the contract did not require the anesthesiologists to supervise the CRNAs in person. Instead, as Dr. Green and Don Ciulla, the hospital's executive director, testified, the anesthesiologists were only required to be on-call and to respond within 30 minutes.

The hospital's anesthesia department had written policies and procedures governing anesthesia care at the hospital. Among the anesthesia department policies and procedures were the following:

- A CRNA could provide "anesthetic patient care only under the direct and personal supervision of a physician."

- Supervision of CRNAs was defined as:

  Anesthesia direction, management or instruction by one who is *physically present or immediately available in the operating suite*. An *anesthesiologist* having such an obligation should not personally be administering another concurrant [sic] anesthetic. If the physician is to render only a portion of the anesthesia care, either through supervision or otherwise, the arrangement must be clearly explained to and understood by the patient. Patient deception, whether deliberate or not, is unethical. [Emphasis added.]

  When an anesthesiologist gives preoperative care but a CRNA administers the anesthetic without the direct supervision of the anesthesiologist, all parties must understand that the professional anesthetic care of the patient during such administration is delegated to the operating physician.

- Regional anesthetics are administered only by physicians or by a CRNA under the direct supervision of a physician when a regional anesthetic is so administered the physician assumes responsibility for the total anesthetic management, and should be personally and immediately available for consultation. (Refer to definition of supervision[] ].

- The responsible anesthesiologist must perform a preanesthetic evaluation and preparation in which the anesthesiologist:

  1. Reviews the Chart

  2. Interviews the patient to:

a. Discuss medical history including anesthetic experiences and drug therapy.

b. Perform any examinations that would provide information that might assist in decisions regarding risk and management.

3. Orders test and medications essential to the conduct of anesthesia.

4. Obtains consultations as necessary.

5. Records impressions on the preanesthesia summary along with brief discussion of planned anesthesia management, techniques, and ASA patient classification.

6. CRNA's will document the visit and discuss the evaluation of their patients with the supervising anesthesiologist or the operating physician. The discussion will be documented by the Anesthesiologist or the operating physician by signing (with the nurse anesthetist) the preanesthetic summary.

• The physician supervisor must review and countersign all orders for medications for treatment of any type, i.e., preop, intraop, and postop anesthesia record and on physician[']s order sheet.

The policies and procedures also provided that a CRNA could be supervised by an operating surgeon who requested a CRNA:

CRNA's may be granted the privilege to render services to patients in the hospital at the request of and under the direct supervision of the physician member of the Medical Staff responsible for the patient. The operating physician requesting the CRNA assumes responsibility for the CRNA's acts or omissions.

In their practice at the Women's Pavilion, DAA's anesthesiologists followed the coverage and CRNA supervision provisions in the contract, rather than the hospital's anesthesia department policy for CRNA supervision. DAA's CRNAs and Drs. Green and Pourzan were not even aware of the hospital's anesthesia department policies and procedures until this litigation. Marliese Mooney, a director of Epic Healthcare Group, Inc. (Epic),

which owned and operated the hospital in January 1991, admitted that DAA's contract appeared to conflict with the hospital's anesthesia department policies and procedures for CRNA supervision.

The hospital also had policies and procedures for patient consent, and the part that applied to anesthesia consent is the following:

G. A separate consent for anesthesia will be completed if the patient's planned procedure requires anesthesia personnel involvement. The consent for anesthesia should be completed in the following manner:

1. Write the patient's (given and surname).

2. Write the anesthesiologist(s) name, (given and surname).

3. In the section for pre-surgical diagnosis write "as discussed with your physician".

4. In the space provided for the procedure, write "anesthesia for_____". (Reference planned surgical procedures).

5. *Ask the patient if the anesthesia plan has been discussed with his anesthesiologist(s).*

6. Ask the patient to date and sign the Disclosure and Consent form.

7. Time and witness the consent, if the above are completed. [Emphasis added.]

When the LaCroixs arrived at the Women's Pavilion with Kathy in labor, they were presented with and signed an anesthesia consent form that had the names of Drs. Green, Pourzan, and Hafiz preprinted on it. None of the physicians knew that the hospital was doing the anesthesia consent for patients at the Women's Pavilion in that manner. Kathy never received a preanesthetic evaluation by an anesthesiologist, and no anesthesiologist ever explained the anesthesia consent to the LaCroixs.

Dr. Dulemba ordered an anesthesia consult for a labor epidural for Kathy. Because Nurse Blankenship, the CRNA on duty in the Women's Pavilion, was involved in another procedure at that time, she told the requesting nurse to call someone else with

DAA. Nurse Hill, who was off-duty, was called, and he came to the Women's Pavilion. Around 9:30 a.m., Nurse Hill placed a catheter in Kathy's epidural space and began her on the anesthetic Marcaine using an epidural pump. No physician ever ordered the Marcaine. After starting the epidural, Nurse Hill reported to Nurse Blankenship what he had done. Nurse Hill then left the Women's Pavilion, and Nurse Blankenship assumed Kathy's anesthesia care.

Around 11:00 a.m., Nurse Blankenship was called to Kathy's labor room because her blood pressure had dropped. Nurse Blankenship turned off the epidural pump and gave Kathy Ephedrine. No physician ever ordered the Ephedrine. When Kathy's blood pressure responded, Nurse Blankenship turned the epidural pump back on.

Butch testified that from the point that the LaCroixs arrived at the hospital, they never were informed that Kathy's anesthesia would be administered by a nurse anesthetist or that Nurse Hill or Nurse Blankenship were nurse anesthetists, not anesthesiologists. All along, Butch thought that Nurse Blankenship was a doctor. Nurse Blankenship admitted that she never told the LaCroixs that she was a nurse anesthetist and was not a doctor. It was undisputed that Kathy was never seen by an anesthesiologist until she had suffered brain damage. It was also undisputed, and even agreed to by all the defendants, that the LaCroixs had a right to know that Kathy was going to be receiving anesthesia care from a CRNA and not from an anesthesiologist. Finally, it was undisputed that no physician ever countersigned in Kathy's medical chart any of the medical treatments that were signed by Nurse Blankenship. The hospital's policies and procedures required that the CRNA's supervising physician sign for the CRNA.

Around 1:30 p.m., Dr. Dulemba decided that a C-section was warranted because of an occasionally low fetal pulse and Kathy's slow cervical dilation. While the C-section was an emergency in that it was unscheduled, it was not a "stat" emergency C-section that had to be done immediately. On her own and without a physician's order, Nurse Blankenship discontinued the Marcaine and began Kathy on Nesacaine, a C-section epidural anesthetic, in her labor room. Nurse Blankenship gave Kathy a total of 20 ccs of Nesacaine.

Nurse Blankenship testified that she cannot administer anesthesia without the medical direction of a physician and that she administered anesthesia and other drugs to Kathy under Dr. Dulemba's medical direction and supervision. Dr. Dulemba testified that he did not give Nurse Blankenship medical direction for her anesthesia care of Kathy, that he did not supervise Nurse Blankenship, and that he would never supervise a CRNA because he is not qualified to do so.

Butch was in the operating room for the C-section. Before the C-section began, Kathy complained several times of breathing difficulty. When Dr. Frank McGehee, the pediatrician who was going to treat the baby after she was delivered, arrived in the operating room, he noticed that Kathy appeared to be in respiratory distress and heard her say, "I can't breathe." Dr. McGehee asked Nurse Blankenship if Kathy was okay, and she responded that Kathy was just nervous, so Dr. McGehee went about preparing his pediatric equipment. Butch testified that soon after that, Kathy's eyes "got big" and she whispered again to him that she could not breathe. Butch, alarmed, stood up and shouted, "She can't breathe. Somebody please help my wife." Nurse Blankenship asked that Butch be removed from the operating room because Kathy was having what appeared to her to be a seizure and Nurse Blankenship knew that she might have to put Kathy to sleep and intubate her. Butch was escorted out of the operating room.

Nurse Blankenship, who could not establish an airway with an airbag and mask because Kathy's teeth were clenched shut from the seizure, told Dr. Dulemba, in response to his asking her whether he should continue, to take the baby, rather than stop the C-section. She also told one of the nurses: "Get one of the anesthesiologists here *now!*" [Emphasis in hospital chart.] Dr. Green, who was in his car, was paged. When he received the page, he immediately drove to the Women's Pavilion.

Dr. Dulemba was already making the C-section incision when the seizure occurred, and he told Nurse Blankenship that Kathy's blood was dark, as opposed to oxygenated blood, which is bright red. When Lawryn was delivered, she was not breathing, and Dr. McGehee had to resuscitate her. Meanwhile, to intubate Kathy to establish an airway for her, Nurse Blankenship had to paralyze her, using the drug Anectine, and put her to sleep, using Sodium Pentothal, a general anesthetic. She was then able to intubate Kathy, but it was an esophageal intubation, rather than tracheal. At that time, a nurse in the Women's Pavilion sounded a "Code 99" throughout the entire hospital. After Dr. Dulemba, who was still working inside Kathy's abdomen, pointed out that he thought that the intubation was esophageal, Nurse Blankenship removed the tube and successfully intubated Kathy.

While Dr. Dulemba was closing the C-section incisions, Kathy's blood pressure and pulse dropped, and Nurse Blankenship gave her Ephedrine to try to raise her blood pressure. Kathy then became asystole—she went into full cardiac arrest and her heart stopped beating.

A physician and nurse from the hospital's emergency room had responded to the code and came into the operating room. Dr. McGehee testified that the emergency room physician said that he did not know how to resuscitate pregnant women and left without providing any medical care.

Dr. Dulemba and a nurse began CPR on Kathy, and Dr. McGehee, once he was finished treating Lawryn, took control of the code and directed nurses to give Kathy atropine and Epinephrine to resuscitate her. Kathy's heart resumed beating after one dose of Epinephrine.

Dr. Pourzan, who was doing a procedure in the hospital's main operating room, was told about the Code 99, got someone to take over his case, and rushed to the Women's Pavilion. He arrived after Kathy had been resuscitated and took over Kathy's care from Dr. McGehee. Dr. Green also arrived after Kathy had been resuscitated.

Although Kathy was resuscitated, she had suffered an irreversible brain injury caused by hypoxia (deprivation of oxygen to the brain). She was comatose for 3 days and was hospitalized for a total of 13 days. Kathy was then transferred to Epic's Flow Rehab Hospital for rehabilitation, where she stayed for 50 days. Because of her brain injury, Kathy has a full scale IQ of 76, which places her on the borderline of intellectual functioning, and she is totally and permanently disabled from independent living.

## Procedural Background

The LaCroixs originally sued the hospital and the entities that owned it, Nurse Blankenship, and Drs. Green, Pourzan, and Hafiz. Nurse Blankenship and Dr. Hafiz settled with the LaCroixs by paying $500,000 and $750,000, respectively, for a total settlement of $1.25 million. Dr. Hafiz was the DAA anesthesiologist on call for the Women's Pavilion on the day of Kathy's incident.

In their First Amended Petition, the LaCroixs alleged:

> One of the most important aspects of this case was that no anesthesiologist was physically present or immediately available in the Women's Pavilion when such services were desperately needed. A reasonably prudent anesthesiologist would have prevented the severe brain damage that was inflicted....

Among the LaCroixs' specific negligence allegations against the hospital directly were the following:

- representing to the public that it provided the highest quality of anesthesia care when, in fact, it only provided unsupervised CRNAs
- failing to adopt, implement, or enforce policies about preanesthesia evaluation and failure to provide an anesthesiologist
- failing to provide qualified anesthesia care, failing to provide an MD anesthesiologist or have one supervising the CRNA
- failing to disclose that a nurse, not a doctor, would be providing anesthesia care
- failing to exercise care in credentialing CRNAs and the MD anesthesiologists

• failing to insure proper quality assurance and peer review in the anesthesia department.

The LaCroixs also alleged that the hospital was liable for the conduct of the nurses and physicians under the doctrines of respondeat superior and ostensible agency.

After a lengthy trial, the jury first found that a physician-patient relationship existed between Kathy and Drs. Green, Pourzan, and Hafiz before Kathy initially suffered her injury. The jury then found that Nurse Blankenship [1] and Drs. Green,[2] Pourzan, and Hafiz were either not negligent or not a proximate cause of Kathy's injury by answering "No" for each of them in response to the following question: "Did the negligence, if any, of those named below proximately cause the injury or injuries, if any, to Katherine 'Kathy' LaCroix?" [3] Because of the jury's "No" answers for the nurse and physicians, the jury did not answer the jury questions that asked if they acted as agents for the hospital in their treatment of Kathy.

The jury found that Epic and the hospital were negligent,[4] apportioning 60% of the negligence to Epic and 40% to the hospital.[5] The jury also found that the hospital was grossly negligent but that Epic was not.

The jury awarded Kathy actual damages of $4,910,014.50 and Lawryn actual damages of

1. The trial court gave the following negligence and proximate cause instructions for Nurse Blankenship:

   "Negligence," when used with respect to the conduct of Carol Blankenship, means failure to use ordinary care, that is, failing to do that which a certified registered nurse anesthetist of ordinary prudence would have done under the same or similar circumstances or doing that which a certified registered nurse anesthetist of ordinary prudence would not have done under the same or similar circumstances.
   . . . .
   "Ordinary care," when used with respect to the conduct of Carol Blankenship, means that degree of care that a certified registered nurse anesthetist of ordinary prudence would use under the same or similar circumstances.
   "Proximate cause," when used with respect to the conduct of Carol Blankenship, means that cause which, in a natural and continuous sequence produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a certified registered nurse anesthetist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

2. The trial court gave the following negligence and proximate cause instructions for Dr. Green:

   "Negligence," when used with respect to the conduct of Christian Green, M.D., means failure to use ordinary care, that is, failing to do that which an anesthesiologist of ordinary prudence would have done under the same or similar circumstances or doing that which an anesthesiologist of ordinary prudence would not have done under the same or similar circumstances.
   "Ordinary care," when used with respect to the conduct of Christian Green, M.D., means that degree of care that an anesthesiologist of ordinary prudence would use under the same or similar circumstances.
   "Proximate cause," when used with respect to the conduct of Christian Green, M.D., means that cause which, in a natural and continuous sequence produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an anesthesiologist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.
   Identical jury instructions were given for Drs. Pourzan and Hafiz.

3. Given the wording of the jury question, it is impossible to determine whether the jury found that Nurse Blankenship and Drs. Green, Pourzan, and Hafiz were not negligent, were not a proximate cause, or were neither.

4. The trial court gave separate, similar negligence and proximate cause instructions for Epic and the hospital. For Epic, negligence was defined as "failing to do that which a corporation of ordinary prudence that owns health care facilities would have done under the same or similar circumstances or doing that which a corporation of ordinary prudence that owns health care facilities would not have done under the same or similar circumstances." For the hospital, negligence was defined as "failing to do that which a hospital of ordinary prudence would have done under the same or similar circumstances or doing that which a hospital of ordinary prudence would not have done under the same or similar circumstances."

5. The LaCroixs sought and obtained a jury finding that the hospital and Epic operated together as a single business enterprise. Neither the hospital nor Epic challenges that finding on appeal.

$5 million. Butch was awarded $100,000 in actual damages for loss of consortium and $350,000 in actual damages for bystander mental anguish. The jury did not award the LaCroixs any punitive damages against the hospital.

The trial court entered a judgment against the hospital and for the LaCroixs, awarding the LaCroixs approximately $8.8 million in damages after applying the $1.25 million settlement credit. In the judgment the trial court disregarded, on the hospital and Epic's motion, the jury's $350,000 award to Butch for bystander mental anguish.

### Points of Error

The hospital and Epic (collectively the hospital) raise three points of error. In its first point of error, the hospital contends that the trial court erred in denying its motion for judgment and in granting judgment for the LaCroixs because all of the health care providers were found not to have been negligent and a proximate cause of any injury to Kathy. The first point is broken down into three subpoints:

A. As a matter of law, the hospital cannot be vicariously liable under the doctrines of respondeat superior or an agency theory because all of the health care providers were found not to have been negligent and a proximate cause of any injury to Kathy.

B. As a matter of law, the hospital cannot be directly liable under a theory of negligent supervision or negligent credentialing because all of the health care providers were found not to have been negligent and a proximate cause of any injury to Kathy.

C. As a matter of law, the hospital cannot be directly liable under a theory of negligent enforcement of its anesthesia policies because all of the health care providers were found not to have been negligent and a cause of any injury to Kathy.

In its second point of error, the hospital contends that the trial court erred in denying its motion for judgment and in granting judgment for the LaCroixs because the evidence is legally and factually insufficient to support recovery under the theory of the hospital's failure to provide adequate anesthesia equipment.

In the hospital's third point of error, it contends that the trial court erred in denying its motion for judgment and in granting judgment for the LaCroixs because the evidence is legally and factually insufficient to support a judgment that breach of a duty owed by the hospital was a cause-in-fact of any injury to the LaCroixs.

### Standard of Review

In determining a "no evidence" or legal insufficiency point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.1994); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. See Browning–Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.1993).

A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. See Juliette Fowler Homes, Inc. v. Welch Assocs., 793 S.W.2d 660, 666 n. 9 (Tex.1990); Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361, 362–63 (1960).

An assertion that the evidence is "factually insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. See Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination and, if

reversing, to detail that evidence in the opinion. *See Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

## Vicarious Liability

Under subpoint 1–A, the hospital points out that a defendant can be vicariously liable under the doctrines of respondeat superior or apparent/ostensible agency only if the employee or agent is negligent and proximately causes the occurrence in question. *See Duff v. Yelin,* 721 S.W.2d 365, 370 (Tex.App.—Houston [1st Dist.] 1986), *aff'd,* 751 S.W.2d 175 (Tex.1988); *Brownsville Med. Ctr. v. Gracia,* 704 S.W.2d 68, 74–75 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *e.g., Baptist Mem. Hosp. Sys. v. Smith,* 822 S.W.2d 67, 72 (Tex.App.—San Antonio 1991, writ denied). Under subpoint 1–B, the hospital again points out that in cases based on theories such as negligent hiring, negligent entrustment, or negligent supervision, the person who was negligently hired, entrusted, or supervised must have been negligent and a proximate cause of the injury. *See St. Paul Med. Ctr. v. Cecil,* 842 S.W.2d 808, 813–14 (Tex.App.—Dallas 1992, no writ); *Park N. Gen. Hosp. v. Hickman,* 703 S.W.2d 262, 265–66 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *Clark v. Harris Hosp.,* 543 S.W.2d 743, 745 (Tex.Civ.App.—Fort Worth 1976, no writ); *cf. Portlock v. Perry,* 852 S.W.2d 578, 583 (Tex.App.—Dallas 1993, writ denied).

■ Despite the hospital's accurate recitation of several well-established points of law where liability is *vicarious,* we hold that these points are inapposite to the LaCroixs' *direct* liability claims against the hospital addressed below. The LaCroixs' pleadings and their appellate briefs show that their primary claim against the hospital is that the hospital, by entering into the contract with DAA that controverted its own anesthesia department policies and procedures governing CRNA supervision by an anesthesiologist or by another, qualified physician, breached a direct duty owed to Kathy. This claim is not dependent on the negligence of the health care providers; rather, it is independent of the conduct of the health care providers because it is based on the hospital's independent, direct duty owed to Kathy, thereby causing the plaintiff's injuries.

In subpoint 1–C the hospital argues that, like negligent hiring, negligent entrustment, or negligent supervision claims, a claim based on the hospital's failure to enforce policy and procedures that reflect the standard of anesthesia care for Texas hospitals must be based on a finding of negligence by the individual health care providers, as a matter of law. According to the hospital, the jury could not have determined that Kathy's injury was caused by the hospital's failure to provide competent anesthesia care because it failed to find the treating anesthesiologists and Nurse Blankenship negligent. This argument is premised on the same vicarious liability theories rejected above. Furthermore, it ignores the evidence discussed in detail below showing that the hospital had a direct duty to provide Kathy with anesthesia care independent of the care that the evidence established was required of the other defendants.

Because we hold the hospital can be held directly liable to Kathy for its own negligence, the jury's failure to find culpability on the part of other medical providers is immaterial to the issue of the hospital's liability. *See* Terry O. Tottenham, *Current Hospital Liability in Texas,* 28 S. Tex. L.Rev. 1, 10 (1987) (the theory of corporate liability "will hold the hospital culpable, notwithstanding charges of medical malpractice against any other defendant"). Under the evidence discussed below, the jury was free to hold the hospital culpable without finding liability on the part of any other defendant.

We overrule point of error one.

## Direct (Corporate) Liability of Hospital

In the hospital's third point of error, it contends that the evidence is legally and factually insufficient to support a finding that a breach of duty owed by the hospital was a cause-in-fact of any injury to Kathy.[6] The

6. The argument under the third point of error is premised, in part, on the assumption that Kathy's

claim against the hospital is based on the hospital's negligent supervision of Nurse Blankenship

LaCroixs contend that the evidence is sufficient to establish that the hospital owed a duty to Kathy to have an anesthesiologist provide or supervise all of Kathy's anesthesia medical care, including having an anesthesiologist personally present or immediately available in the operating suite, and that the hospital's breach of this duty proximately caused Kathy's brain damage.

■ Under Texas law, a hospital may be liable independently of the negligence of its physicians or employees. Hospital liability under this direct theory of liability arises from the negligent performance of a duty owed directly to the patient. *See generally* 2 RICHARD L. GRIFFITH & DEWEY W. JOHNSTON, TEXAS HOSPITAL LAW § 3.03, at 63.1–71 (2d ed.1995); T. Tottenham, *Current Hospital Liability in Texas,* 28 S. TEX. L.REV. at 10–19; Jim M. Perdue, *Direct Corporate Liability of Hospitals: A Modern Day Legal Concept of Liability for Injury Occurring in the Modern Day Hospital,* 24 S. TEX. L.J. 773, 774 (1983). Among these direct duties are:

- A duty to provide its patients with appropriate and usable medical equipment. *See, e.g., Bellaire Gen. Hosp., Inc. v. Campbell,* 510 S.W.2d 94, 98 (Tex.Civ. App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.); *cf. Hernandez v. Smith,* 552 F.2d 142, 144 (5th Cir.1977) (duty to provide adequate facilities).

- A duty to keep its premises in a reasonably safe condition. *See Charrin v. Methodist Hosp.,* 432 S.W.2d 572, 574–75 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ).

- A duty to the patient not to negligently allow termination of medical care. *See Gracia,* 704 S.W.2d at 77; *Valdez v. Lyman–Roberts Hosp., Inc.,* 638 S.W.2d 111, 114 n. 1 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

- A duty to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysi-

cian personnel. *See Air Shields, Inc. v. Spears,* 590 S.W.2d 574, 576–81 (Tex.Civ. App.—Waco 1979, writ ref'd n.r.e.).

- A duty to exercise reasonable care in the selection of its medical staff and a duty to periodically monitor and review the medical staff's competency. *See Hickman,* 703 S.W.2d at 265–66.

■ There are four elements that must be proved to prevail on a medical negligence cause of action: (1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. The test for determining whether a hospital has a duty of care and whether that duty has been breached is what an ordinary hospital would have done under the same or similar circumstances. *See Hilzendager v. Methodist Hosp.,* 596 S.W.2d 284, 286 (Tex.Civ.App.— Houston [1st Dist.] 1980, no writ); *see also* 2 GRIFFITH, TEXAS HOSPITAL LAW § 3.011, at 49.

■ In medical negligence cases, the medical standard of care of the defendant is the threshold issue that a plaintiff must establish before the factfinder determines if the defendant deviated from the standard of care to a degree that constitutes negligence. *See Johnson v. Berg,* 848 S.W.2d 345, 348 (Tex.App.—Amarillo 1993, no writ); *Coan v. Winters,* 646 S.W.2d 655, 657 (Tex.App.— Fort Worth 1983, writ ref'd n.r.e.); 2 GRIFFITH, TEXAS HOSPITAL LAW § 3.011, at 49. As a general rule, expert testimony is required to establish the governing standard of care and to determine whether the standard has been breached. *See Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Harle v. Krchnak,* 422 S.W.2d 810, 814–15 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.) (op. on reh'g). While the standard of administrative care at a hospital may be established by lay testimony,

and Drs. Green, Pourzan, and Hafiz. However, as noted above, the LaCroixs' claim is that the hospital had and breached a *direct* duty to Kathy to provide an anesthesiologist to supervise the administration of anesthesia to Kathy; their claim is not that the hospital negligently super-

vised DAA's anesthesiologists and CRNAs. We therefore must review the evidence to determine if it is sufficient to support a finding that the hospital breached a *direct* duty to Kathy that proximately caused her injury.

expert testimony is required when the underlying issue involves the performance of medical procedures. *See Cecil,* 842 S.W.2d at 814. Because this case ultimately turns on whether the standard of care required the hospital to require CRNA supervision by an anesthesiologist, the LaCroixs were required to present expert testimony on the hospital's standard of care. *See, e.g., Downing v. Gully,* 915 S.W.2d 181, 185 (Tex.App.—Fort Worth 1996, writ denied); *Southwest Tex. Methodist Hosp. v. Mills,* 535 S.W.2d 27, 30 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.). *See generally* 2 GRIFFITH, TEXAS HOSPITAL LAW § 3.012, at 49–52.

■ In determining the standard of care, we may also look to the hospital's internal policies and bylaws, as well as the standards of the Joint Commission on Accreditation of Health Care Organizations (JCAHO).[7] However, these factors alone do not determine the governing standard of care. *See Hicks v. Canessa,* 825 S.W.2d 542, 544 (Tex.App.—El Paso 1992, no writ); *Hilzendager,* 596 S.W.2d at 286; *see also Foley v. Bishop Clarkson Mem. Hosp.,* 185 Neb. 89, 173 N.W.2d 881, 884 (1970); *Darling v. Charleston Community Mem. Hosp.,* 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966). *See generally* 2 GRIFFITH, TEXAS HOSPITAL LAW § 3.0332, at 67.

### Standard of Care and Breach

As discussed above, the hospital's anesthesia department policies and procedures required that an anesthesiologist perform the preanesthesia evaluation, that an anesthesiologist discuss with the patient the anesthesia plan, and that an anesthesiologist supervise a CRNA by being "physically present or immediately available in the operating suite." Also, an operating surgeon who requested a CRNA could supervise the CRNA and would be responsible for the CRNA.

The hospital, which opened the Women's Pavilion in 1986, initially entered into an exclusive contract with DAA to provide anesthesia care for the Women's Pavilion. The May 31, 1990 contract was a renewal of DAA's initial exclusive contract with the hospital. Ciulla was in charge of the DAA contract, which was drafted by Epic's legal department. According to Ciulla, he renewed the contract in conjunction with the hospital's medical staff.

Ciulla admitted that before he renewed the contract with DAA, he had been warned by anesthesiologists who practiced at the hospital that DAA's CRNAs were not being properly supervised in the Women's Pavilion. Both Dr. Mickey Via, chairman of the hospital's anesthesiology department in 1991, and Ciulla testified that Dr. Via and other anesthesiologists had complained to Ciulla about the lack of proper CRNA supervision in the Women's Pavilion. Dr. Via said that in renewing the contract with DAA, Ciulla did nothing to address the complaints that had been made.

According to Ciulla, he renewed the contract in conjunction with the hospital's medical staff. According to Dr. Via, the hospital's medical executive committee recommended to Ciulla that he not renew DAA's contract and that he seek another anesthesia group for the Women's Pavilion, but the hospital's board of directors renewed the contract anyway.

Four months before Kathy and Butch went to the hospital to have their baby, Dr. Via wrote a memo dated September 10, 1990 to Ciulla complaining that DAA's CRNAs in the Women's Pavilion were still not being supervised by DAA's anesthesiologists. The memo reads in full:

Chairmen of the various Medical Departments of DRMC are responsible for 1.) monitoring clinical work within their departments, 2.) referring to the medical

---

7. The JCAHO Accreditation Manual for Hospitals is basically a document that addresses a 'standard' and 'characteristics' of the expected elements of hospital-wide policies, departmental policies and procedures, and those of the medical staff as might be expressed in medical staff bylaws, rules and regulations, or policy. Such policy and procedure manuals are *hospital-specific* and can be viewed as setting the standard of care for that institution.

2 GRIFFITH, TEXAS HOSPITAL LAW § 3.0121, at 49.0. "These standards were formulated by the JCAHO as *ultimate goals* and not as universal minimal standards." *Id.* § 3.032, at 65.

staff issues involving quality of patient care, and 3.) enforcement of hospital By–Laws and Departmental Rules and Regulations. During the past four years, staff anesthesiologists repeatedly have voiced concern regarding the medical supervision, or lack thereof, of nurse anesthetists (CRNA) administering anesthetics at DRMC. Administrators at DRMC not only have failed to heed these concerns but seemingly have promoted the practice by their inaction and the contractual arrangements in the Women's Pavilion. As I steadfastly defend that anesthesiology is the practice of medicine and that only licensed physicians can legally practice medicine in Texas, I refer the current practice of CRNA employees of Denton Anesthesia Associates to your attention as it is not in compliance with guidelines and standards of care of various regulatory bodies.

Following resolution of a new anesthesia contract in 1990 for the Women's Pavilion, it has become apparent that the contracted anesthesiologists frequently are not present in that facility while anesthetics are being provided by nurse employees. This practice recently has been estimated to occur between 50 and 75 percent of the time. Additionally, nurse employees of Denton Anesthesia Associates on several occasions have provided anesthetics in the "main operating room" of DRMC without supervision by their employers.

With this ongoing practice of anesthesia at our facility, I feel the following questions need review and clarification for all concerned.

I. Are patients *informed* that their anesthesia may be provided wholly, or in part, by a CRNA?

II. Since CRNA's are not licensed physicians, who is '*supervising*' their activities?

III. What is the definition of *medical supervision?* (In view of limitations of other Allied Health Professionals at DRMC, the definition has been established.)

IV. If a CRNA administers an anesthetic without direct supervision by an anesthesiologist, who assumes the responsibility of the CRNA's activities? If the surgeon assumes responsibility, does he understand this? Does a supervising surgeon need privileges and training in anesthesia, ACLS certification, etc.?

V. If a CRNA administers an anesthetic without direct supervision by their employer, can the employer bill for services (not) rendered?

When I review these questions, I look, in part, to the following information.

I. Current guidelines of several regulatory bodies, define medical direction, in part, as physical presence, personal participation, and not personally administering another anesthetic.

II. Nurse Anesthetists are licensed nurses trained in the technical skills of anesthesia care under the supervision of a physician (as required by the Nurse Practice Act of Texas and By–Laws of DRMC (Article IV, [S]ection 8)).

III. Billing for 'ghost' or 'token' medical services is unethical and, possibly, fraudulent. By–Laws of DRMC (Article III, Section 2.2) require that each member of the medical staff "shall pledge to adhere to the ethical principles of their profession" including "refraining from providing ghost medical services."

The intent of this communication is not to destroy or disrupt the ongoing practice of anesthesia by CRNA's at DRMC. However, the manner in which the CRNA's employed by Denton Anesthesia Associates are practicing at DRMC is contrary to the concept which I perceive after reviewing the above parameters. It is my goal for the medical staff to review, discuss and understand these regulatory guidelines relating to the practice of anesthesia, to understand supervision and responsibility for CRNA activities, and thereafter, to accept or alter this ongoing practice of anesthesia.

Ciulla admitted that, in response to Dr. Via's memo, he told Dr. Via to "mind his own business." He also admitted that as chairman of the hospital's anesthesia department, which included the Women's Pavilion, it was Dr. Via's duty and responsibility to monitor

the quality of anesthesia care at the Women's Pavilion.

Dr. Via testified that the primary reason for hospital policies and procedures is to "try to ensure a standard that would promote the best care for the patient." He added that "they are formulated to guide the hospital staff along lines that will ensure the best outcome for the patient. It [the policies and procedures] represents a standard of care for your patients, and the goal of that is to ensure quality of care." On enforcing the hospital's policies and procedures, Dr. Via testified:

A. To enforce the rules and regulations, as—as I think we've already discussed, those are formulated to try to ensure a level of care that would hopefully ensure a good outcome, quality care for the patient. And so that enforcement would—would be an important step in ensuring that care.

Dr. Via further testified:

Q. Do you have an opinion as to whether or not the policies and procedures and the discharge of your responsibilities acted as a check and balance or safeguard for the patient's safety?

A. I would certainly think that if the department members followed the rules and regulations it would come as close as one could have it in ensuring quality of care.

Q. Okay. And what if they don't follow the policies and procedures? What if the hospital does not follow the policies and procedures?

. . . .

A. I think it'd open up—opens up the possibility of less than quality of care. An injury, a problem, [a] complication.

Dr. Via testified about his concern that DAA's CRNAs were without proper supervision—without an anesthesiologist being present—which went against the guidelines of the American Society of Anesthesia [the ASA]. Although Dr. Via did state that the ASA guidelines, standing alone, were not the standard of care for Denton, he gave specific testimony on what the hospital's standard of

care was for providing anesthesia care in general and for CRNA supervision:

Q. Do you have an opinion as to whether or not those ASA guidelines provide— provided the standard of care for the hospital during this period of time?

A. The department of anesthesia at Denton Regional Medical Center had adopted in large part the ASA guidelines for standard of care. We were using those guidelines as our standard of care, the recommended guidelines of the American Society of Anesthesia.

. . . .

Q. All right. I'd like to visit with you just a little bit about the standard of care for providing anesthesia. What is the safest and the best way to provide anesthesia care, most ideal way to provide anesthesia?

. . . .

A. Could I ask for a clarification?

Q. Sure.

A. Are you asking me what my opinion is is the safest anesthetic that can be provided?

Q. Right.

A. I believe by an anesthesiologist.

Q. All right. Why is that?

A. I think that they're the most highly trained person who practices anesthesia.

Q. Okay. And that—obviously, that's within the standard of care? If anesthesia is provided by an anesthesiologist, that satisfies the standard of care?

A. That would be one element of it, yes.

Q. All right. Now, what would be the second manner in which, if properly done, anesthesia can be provided under a standard of care?

A. The way we had adopted the rules and regulations, the department of anesthesia, consistent with American Society of Anesthesia, was that—the team concept. And the team concept was the CRNA being supervised, personally supervised by an anesthesiologist.

Q. All right. Now, when you—in order to—in order for you to provide anesthesia to a patient—Let's say a patient comes

into the hospital; and in order to provide safe anesthesia care under this second category, what must occur between the patient and the care that's being provided?

A. If I follow you, the—the—the CRNA does the anesthesia; but the—the guidelines state that the anesthesiologist has to be—the anesthesiologist has to see the patient prior to, you know, the preoperative evaluation, developing the plan of anesthesia, and then the anesthesiologist has to be present during parts of that case.

. . . .

Q. All right. What is the third way that—or is there a third way that anesthesia can be provided?

A. Yes. You can have a CRNA do the anesthesia supervised by another physician.

Q. All right.

A. I think our rules and regulations cover that, too. Another physician means a non-anesthesiologist.

Dr. Via explained that for this third level of anesthesia care to occur, the supervising physician has to be aware that he is supervising and responsible for the CRNA and accept that responsibility, and the patient must be informed. This situation, he said, would be within the standard of care.

Dr. McGehee, who also was the hospital's chief of staff at the time, testified that the absence of an anesthesiologist in Kathy's situation was negligence and that Kathy did not receive standard of care medical treatment. Dr. McGehee also testified that Kathy did not receive standard of care treatment for an anaphylactic reaction. He did not specify in his testimony if the standard of care that he referred to was for anesthesiologists or for hospitals.

Dr. James Temple, an expert witness for the LaCroixs, testified about the hospital's standard of care as follows:

Q. All right. In your looking into this case, do you see any difference between Denton, Irving, Lewisville or Dallas? Is there any substantial difference in what should be done in those communities?

A. No, I do not think so.

Q. Why is that?

A. Well, first of all, Denton is really not a small little town in west Texas removed from a major metroplex. Denton is really a part of the metroplex of Dallas/Fort Worth. Therefore, only thirty minutes away is care given to a patient the standard of care which is an anesthesiologist taking care of a nurse anesthetist. So that is the level of standard of care that is adhered to in the Denton community as well.

. . . .

Q. Doctor, do you have a copy of the ASA guidelines and standards in front of you?

A. Yes, sir.

Q. Do you think that these guidelines and standards play a role in determining what the standard of care was at Denton Regional Medical Center for anesthesia care in the Women's Pavilion on January 21st, 1991?

A. Yes, I do.

. . . .

Q. Okay. And under your theory, whenever there is a CRNA on the case, there has to be an M.D. anesthesiologist immediately available in the physical area; right?

A. According to the standard of care set in this community, yes, sir.

Q. We'll talk about the standard of care set in the community in a minute. But that's your opinion; correct?

A. Correct.

Q. So if there's a CRNA in the Women's Pavilion, there would have to be an anesthesiologist in the Women's Pavilion to supervise?

A. If the CRNA is doing the anesthetic, there should be an M.D. anesthesiologist immediately available to supervise.

Dr. Temple then read what he considered to be the applicable ASA guidelines, which were: (1) the presence of qualified anesthesia personnel; (2) the anesthesiologist is to medically direct the administration of anesthesia; (3) where an anesthesiologist medically directs a non-physician (a CRNA), the anesthesiologist's responsibilities include conducting

the preanesthesia evaluation and prescribing the anesthesia plan; and (4) personal participation in the anesthesia induction and emergence. Dr. Temple concluded that the administration of anesthesia by Nurses Hill and Blankenship without the supervision of an anesthesiologist was below the standard of care.

Dr. Green gave the following testimony about the standard of care for CRNA supervision:

Q. Do you have an opinion, Doctor, as to whether the method of supervision, of providing administrative supervision under the contract, of providing medical direction or intraoperative supervision when requested and having the—seeing to it that the obstetricians would be supervising in your absence, do you have an opinion as to whether that was consistent with good and accepted standards of obstetrical anesthesia care?

A. I think it was acceptable anesthesia care and well within the standard of care, yes.

Dr. Green said that Nurse Blankenship was not unsupervised because Dr. Dulemba was supervising her. Dr. Pourzan also testified that Dr. Dulemba was supervising Nurse Blankenship.

According to Dr. Dulemba, the obstetrical department had previously met with DAA's anesthesiologists, who explained to the obstetricians that the obstetricians could supervise DAA's CRNAs, but the obstetricians took the position that they would not because they did not have the expertise. Dr. Dulemba testified that he did not specifically request anyone from DAA to provide anesthesia care for his patients. But he did say that it was common for CNRAs to be used in obstetrics in Denton County.

Dr. Dulemba testified that he did not give Nurse Blankenship medical direction for her anesthesia care of Kathy, that he did not supervise Nurse Blankenship, and that he would never supervise a CRNA because he is not qualified to do so. Dr. Dulemba also said that he was not supervising Nurse Hill, who began Kathy's labor epidural. It was his understanding that the anesthesiologists in DAA were supervising Nurse Hill and that they were "immediately available" if he or Nurse Blankenship needed help. He agreed that under the hospital's policies and procedures, "immediately available" meant physically present or immediately available in the operating suite. He also said that it was his understanding that the anesthesiologists in DAA were supervising Nurse Blankenship.

Dr. Lawrence Slocki, an obstetrician who assisted Dr. Dulemba on Kathy's C-section, testified that neither he nor Dr. Dulemba had supervised a CRNA in the Women's Pavilion, that anesthesia care needed to be supervised by an anesthesiologist, and that it was his understanding that obstetricians were not supposed to be supervising anesthesia.

Dr. Lewis Coveler, an anesthesiologist and one of the hospital's experts, testified that the standard of care for CRNA supervision was met in this case because Dr. Dulemba was supervising Nurse Blankenship because no anesthesiologist was present. He said it is within the standard of care for a surgeon to supervise CRNAs, although at the two Houston hospitals where he practices, anesthesiologists are required to supervise CRNAs. He was aware that the hospital held out the Women's Pavilion as providing as high a standard of care as any hospital in the metroplex, and he admitted that hospitals that maintain the highest level of care are usually going to require that CRNAs be supervised by anesthesiologists. He agreed that allowing a CRNA to be totally unsupervised would be negligence. He also said that a hospital would be negligent if it attempted to require a surgeon to supervise a CRNA and the surgeon felt unqualified to supervise a CRNA.

Dr. James Poston, a Wichita Falls anesthesiologist and an expert witness for Drs. Green and Pourzan, testified that at his hospital, if an anesthesiologist is not present on the obstetrical floor, the operating surgeon is responsible for supervising the CRNA. He said that this hospital practice and the similar practice that he said occurred at the Women's Pavilion, were within the standard of care. Dr. Poston said that based on the hospital's policies and procedures and DAA's

contract, if an anesthesiologist was not present, then the surgeon is supervising the CRNA. He did agree that it was partly the hospital's responsibility to ensure that a CRNA is being supervised.

Dr. Brian Bormann, a Fort Worth anesthesiologist who practices at Harris Methodist Hospital and another expert for Drs. Green and Pourzan, testified that at Harris, CRNAs are supervised by anesthesiologists for major surgery but not for local anesthetic procedures (monitored anesthesia care) where the surgeon or other physician supervises the CRNA. At Harris, he said that CRNAs are supervised by anesthesiologists for C-sections. Dr. Bormann explained that one of the reasons for that is because it is better care for the patient and it is an attempt to provide the finest in total health care.

In Dr. Bormann's opinion, Dr. Dulemba was supervising Nurse Blankenship. But he agreed that if there was confusion at the hospital about who was supervising DAA's CRNAs and the hospital failed to clear up the confusion, the hospital's conduct could be negligent.

## Causation

Dr. Lloyd Redick, a Duke University medical professor of anesthesiology and associate professor of obstetrics, testified that Kathy's brain damage was caused by a "high block"[8] that resulted from being given too high of a dosage of Nesacaine and that her respiratory distress was not recognized and treated quickly enough. Dr. Temple shared this opinion. Both doctors opined that if an anesthesiologist had supervised the administration of Kathy's anesthesia, the high block would not have occurred, or would have been recognized and treated more promptly, and that the hospital's failure to have an anesthesiologist present and performing, or directly

supervising, Kathy's anesthesia care was a direct cause of her brain damage. Dr. McGehee also testified that Kathy "failed to receive the proper treatment" and that her situation "should have been prevented."

The hospital and Drs. Green and Pourzan presented several expert witnesses who testified that Kathy had an unpredictable "anaphylactic" reaction (a severe allergic reaction) to the Nesacaine[9] and that the presence of an anesthesiologist would not have affected the outcome because the anaphylactic reaction that caused Kathy's cardiopulmonary arrest could not have been prevented.[10] However, Drs. Redick and Temple testified that an anesthesiologist would have determined through preanesthesia evaluation that Kathy was a high risk patient for airway problems; would have known to allow for Kathy's labor epidural sensitivity, blood volume depletion, age, weight, and height; and would have reduced the dosage and thus avoided the hypotensive episode and respiratory distress that caused Kathy's hypoxic brain damage.

■ After reviewing the entire record, we hold that the evidence is legally and factually sufficient to support a finding that the hospital owed a duty to Kathy to have an anesthesiologist provide or supervise all of her anesthesia care and that its breach of this duty was the direct cause of her brain injury. As the testimony above reflects, the issues of the duty the hospital owed to Kathy and the medical cause of Kathy's brain injury were at the center of a classic "battle of the experts," and the jury was free to accept or reject either side's theory, both of which are supported by sufficient evidence. *See, e.g., Merrell Dow Pharm., Inc. v. Havner,* 907 S.W.2d 535, 558–59 (Tex.App.—Corpus Christi 1994, writ granted) (op. on reh'g); *Warner v. Hurt,* 834 S.W.2d 404, 408–09 (Tex.App.—Houston [14th Dist.] 1992, no

8. A high block, in the context of regional anesthetics such as Nesacaine, means that the sympathetic nerves in the spinal cord that control breathing are anesthetized and thus do not function.

9. Nowhere in Kathy's medical records from the Women's Pavilion, or from *Epic's Flow Rehab* Hospital, was a diagnosis of anaphylactic reaction made by a physician.

10. Based on the theory that Kathy suffered an unpredictable anaphylactic reaction, the hospital and the physicians sought and obtained a jury instruction on "unavoidable accident" for themselves, Epic, and Nurse Blankenship. The hospital's experts and Drs. Green and Pourzan all testified that what happened to Kathy was an unavoidable accident.

writ); *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 656–57 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.).

We overrule point of error three.

## Inadequate Equipment

In its second point of error, the hospital contends that the trial court erred in denying its motion for judgment and in granting judgment for the LaCroixs because the evidence is legally and factually insufficient to support recovery under the separate theory of the hospital's failure to provide adequate anesthesia equipment. Because we have held that the jury verdict and the judgment can be upheld on the LaCroixs' direct liability claim, we need not consider the second point of error.

## Cross–Point of Error

In his sole cross-point, Butch alleges that the trial court erred in disregarding the jury's award on his bystander recovery for mental anguish damages.

The jury awarded Butch $350,000 in mental anguish damages on his bystander claim. The hospital filed a motion to disregard the jury's $350,000 award, claiming that Texas law does not permit bystander recovery in medical malpractice cases. The trial court agreed and disregarded the $350,000 jury award in the judgment.

The Texas Supreme Court recently decided the precise issue that we face in Butch's cross-point, holding that Texas law does not recognize bystander recovery in medical malpractice cases. *See Edinburg Hosp. Auth. v. Trevino,* 941 S.W.2d 76, 79 (Tex.1997). Accordingly, the trial court did not err in disregarding the jury's $350,000 mental anguish award. We overrule Butch's cross-point.

## Conclusion

We affirm that part of the trial court's judgment disregarding the jury's award on cross-appellee Lawrence "Butch" LaCroix's bystander claim for mental anguish damages. We affirm the remainder of the trial court's judgment awarding damages to appellees Lawrence "Butch" LaCroix, individually, and as next friend of Katherine "Kathy" LaCroix, and as next friend and parent of Lawryn LaCroix against appellants Denton Regional Medical Center and Epic Healthcare Group, Inc.