Joe and Carolyn McCOMBS, Individually and on behalf of the Estate of Samantha McCombs, Appellants,

v.

CHILDREN'S MEDICAL CENTER OF DALLAS, Appellee.

No. 06-98-00079-CV.

Court of Appeals of Texas, Texarkana.

Argued July 27, 1999.

Decided Aug. 13, 1999.

Rehearing Overruled Sept. 21, 1999.

William H. Liebbe, Dallas, for appellant.

Beverly Ray Burlingame, John Martin, Lori Dalton, Thompson & Knight, Dallas, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

OPINION

Opinion by Justice ROSS.

This is an appeal from a no-evidence summary judgment granted in favor of Children's Medical Hospital (Children's) in a medical malpractice action. Children's moved for summary judgment, contending that the McCombses had failed to produce evidence that the care provided to their daughter, Samantha McCombs, failed to meet the applicable standard of care. The trial court granted the summary judgment, and the McCombses appeal.

The facts are undisputed. Samantha McCombs was admitted to Children's on September 5, 1993, for congestive heart failure. Samantha was on the list for a heart transplant. On September 17, 1993, a central venous catheter was placed in Samantha's chest, allowing direct access into a vein for drawing blood and administering medications. Samantha was discharged on September 28, 1993.

On October 13, 1993, Samantha entered Children's Emergency Center (EC) complaining of fever, vomiting, and coughing. Blood was drawn for a culture to determine if there was an infection present. Samantha was given a dose of antibiotics

and was discharged on the same day. Her condition was monitored by a home health nurse.

Two days later, on October 15, 1993, a home health nurse noted a request by Michelle Copeland, R.N., the nurse who served as Children's transplant coordinator, to have additional blood cultures drawn at Samantha's pediatrician's office. Samantha was still experiencing symptoms of nausea, fever, and loss of appetite.

The laboratory reports on the culture drawn on October 13 were reported to the EC on October 18. The laboratory report stated that "no bacteria seen in gram stained smear, rod shaped organisms observed in acridine orange stain only." An EC physician, Cynthia Yu, M.D., called David Fixler, M.D., Samantha's cardiologist, and reported these findings. Yu noted that Fixler "will take care of it." The laboratory reports were reported to the EC because hospital policy required that test results be reported back to the department ordering the test—in this case, the EC.

The laboratory called the EC on October 25 to report additional results from the October 13 blood culture. The laboratory report, which was dated October 26, stated that the culture showed an "acid-fast organism by Kinyoun's stain culture confirmation to follow." Shawn Bohannon, R.N., an EC nurse, received these results by telephone. Although the medical records do not reflect to whom Bohannon reported these results, all parties agree that she reported the results to the attending physician or senior resident on duty in the EC that day. Bohannon did not report the results to Fixler, Samantha's cardiologist.

On November 23, the laboratory reported that the October 13 culture was an "acid-fast organism by Kinyoun's stain rapidly growing mycobacterium species, not M. Tuberculosis." Fixler was made aware of the infection after the November 23 report.

Samantha was admitted to Children's on November 27, 1993. She died two days later. The autopsy revealed that Samantha had suffered from a massive infection, including an infection of the heart valve and muscle. The organism responsible for the sepsis was the same one that had been cultured from the October 13 blood sample, which was first noted in the laboratory report of October 26.

The McCombses filed suit against Children's and ABC Home Health Services on December 7, 1995. ABC Home Health was nonsuited in June 1996. In November 1997, Children's moved for summary judgment under Tex.R. Civ. P. 166a(i), contending that there was no evidence that Children's had breached the standard of care for a hospital in the care rendered to Samantha. The trial judge granted the summary judgment, and the McCombses appeal.

The McCombses bring two points of error. First, they contend that Children's breached the standard of care by failing to report the October 26, 1993, blood culture laboratory results to Fixler. Second, they contend that Michelle Copeland, R.N., breached the standard of care by ordering blood cultures on October 15, 1993, without an order from a physician.

Where a motion is presented under Rule 166a(i) asserting there is no evidence of one or more essential elements of claims upon which the nonmovant would have the burden of proof at trial, the movant does not bear the burden of establishing each element of its own claim or defense as under subparagraph (a) or (b). Rather, although the nonmoving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on the challenged elements. *See* Tex.R. Civ. P. 166a notes and comments.

■ Since a no-evidence summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in review-

ing a directed verdict. *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70 (Tex.App.-Austin 1998, no pet.). We must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *Id.* We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). A no-evidence summary judgment is improperly granted if the nonmovant presents more than·a scintilla of probative evidence to raise a genuine issue of material fact. *Fiesta Mart, Inc.,* 979 S.W.2d at 70–71. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner,* 953 S.W.2d at 711.

To prevail in a medical negligence cause of action, the plaintiff must prove (1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *See Hall v. Huff,* 957 S.W.2d 90, 101 (Tex. App.-Texarkana 1997, pet. denied); *Denton Reg'l Med. Ctr. v. LaCroix,* 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, writ dism'd by agr.). A hospital may be vicariously liable for the negligence of its employees or agents under theories of respondeat superior and ostensible agency if the employee or agent is negligent and proximately causes the injury. *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947–48 (Tex.1998) (a hospital may be vicariously liable for the medical malpractice of independent contractor physicians when plaintiffs can establish the elements of ostensible agency).

A hospital may be directly liable if the hospital breaches a duty which it owes directly to the patient. Such duties include: a duty to provide its patients with appropriate and usable medical equipment; a duty to keep the premises in a reasonably safe condition; a duty not to negligently allow the termination of medical care; a duty to use reasonable care in formulating the policies and procedures which govern the medical staff and non-physician personnel; and a duty to exercise reasonable care in the selections of its medical staff and to periodically monitor and review the medical staff's competence. The test for determining whether a hospital has a duty of care and whether that duty has been breached is what an ordinary hospital would have done under the same or similar circumstances. *LaCroix,* 947 S.W.2d at 950.

The medical standard of care is the threshold issue that a plaintiff must establish before the fact finder determines if the defendant deviated from the standard of care to a degree that constitutes negligence. *Id.* As a general rule, expert testimony is required to establish the governing standard of care and determine whether the standard has been breached. We may also look to the hospital's policies and procedures to determine the proper standard of care, but these policies and procedures alone do not reflect the standard of care. *Id.* at 951.

In the first point of error, the McCombses contend that Children's breached the standard of care by failing to report the October 26 laboratory results to Fixler. The laboratory informed an EC nurse, who then informed the attending EC physician or chief resident of the results, but the nurse did not inform Fixler of the results. The results were never reported to Fixler. The essential question presented is what duty, if any, Children's had in informing Fixler of the laboratory results.

The McCombses argue that Children's was required to report the October 26 laboratory results to Fixler. The McCombses rely on the hospital's expert, Linda Addonizio, M.D., to establish the

standard of care applicable to the hospital. Addonizio stated that "the people who are at that institution where the cultures are would ... be responsible for making sure that somebody is taking care of the infection." When questioned on who the "institution" was, Addonizio stated that the "physicians are the ones who are responsible."

Addonizio also testified in the following exchange:

Q. All right. But the expectation would be that once the emergency room gets the information about the blood cultures being positive, then that would be communicated to—

A. A physician.

Q. —A physician?

A. Uh-huh.

Q. And again, any old physician down the hall or, or—

A. No.

Q. —a member of team[sic]?

A. The physician who is listed on their sheet, their emergency room sheet.

Q. As the attending?

A. Right.

. . . .

Q. And the doctor on the emergency room record for October the 13th as the attending is who?

A. Fixler.

Q. All right. So the emergency room, once they receive notification of the blood culture results, or a change in the blood culture results, needs to notify Dr. Fixler as the attending?

A. Whenever they are notified about the blood culture results.

. . . .

Q. And that's the standard of care?

A. To notify someone of a positive culture, yes.

The hospital's procedure at the time of this incident was for the laboratory to report results back to the department which originally ordered the test, in this case the EC. The laboratory reported the results to the EC, specifically to Bohannon. Bohannon then reported the results to the attending EC physician, as hospital policy required. Bohannon testified that once she reported the information to the attending physician or the senior resident on call working in the emergency room that day, it would then be their responsibility to follow up.

Addonizio indicated that a physician should be notified of a positive blood culture and that physician should be the one listed on the EC sheet, who, in this case, was Fixler. However, Addonizio never identified *who* was responsible for reporting the results to Fixler.

The McCombses failed to produce any evidence of probative force to raise a fact issue on a breach of the standard of care by Children's in failing to report the laboratory results to Fixler. The McCombses did not allege that the laboratory had a duty to report the results to Fixler, nor did the McCombses contend that the hospital's policy that the laboratory report the results to the department which ordered the test was below the standard of care. The McCombses never alleged that Bohannon specifically had a duty to further report the results to Fixler. Finally, the McCombses never alleged that the EC physician to whom Bohannon reported the results was responsible for reporting the results to Fixler. The record supports the proposition that the EC physician was responsible for reporting results to Fixler, because this is what occurred when Yu reported the October 13 results to Fixler.

Since an actor or actors were never identified as breaching the standard of care, it is impossible to determine the appropriate standard of care to be applied. The McCombses' expert never testified as to what the standard of care would be for any given actor responsible for reporting the results to Fixler.

The closest identification of an actor made by Addonizio was that the physicians

were responsible for making sure that "someone was taking care of the infection." However, this does not indicate that any particular physician was responsible for informing Fixler of the laboratory results or that it was a breach of the standard of care for a physician at the institution to fail to inform Fixler.

The hospital itself, as an institution, could not report the results to Fixler; therefore, it is impossible to hold the hospital directly liable for a failure to report the results to Fixler. Finally, the McCombses never challenge the hospital's policies relating to the requirements of the hospital's laboratory and EC nurse to report the results in the manner in which they did in this case, which appears to be the only other applicable theory of direct liability.

The first point of error is overruled.

■ In the second point of error, the McCombses contend that the trial court erred in granting a no-evidence summary judgment as to their allegation that Copeland breached the standard of care by ordering blood cultures on October 15 without a physician's order. On October 15, 1993, a home health nurse noted a request by Copeland to have additional blood cultures drawn at Samantha's pediatrician's office. The McCombses contend that Copeland breached the standard of care by ordering the blood cultures because only a physician had the authority to order a blood culture.

The McCombses' expert testified that it would be improper for a nurse to order a blood culture without a physician's order. Fixler also testified that nurses did not have authority to order laboratory tests at Children's. Copeland also testified that she did not have authority to order blood cultures. The McCombses contend that the absence of a written order by a physician for the blood cultures drawn on October 15 indicates that Copeland ordered the cultures herself, without a physician's order. However, Copeland testified that she

may have relayed a verbal order from the physician to the home health nurse, which might be found in the home health agency's records. Copeland did not remember exactly what took place when the order for the October 15 blood cultures was relayed to the home health nurse, but she testified that she would not have ordered it herself.

Richard Friedman, M.D., the McCombses' expert, testified that after reading the depositions of Copeland, Fixler, and Kathleen Rotondo, M.D., and after reviewing the medical records in this case, he was not prepared to testify that Copeland was negligent.

Although the McCombses established the standard of care which would prohibit Copeland from ordering blood cultures, there is no evidence to establish that she breached that standard. The McCombses simply speculate as to what might have happened, but there is no evidence to support this allegation.

The second point of error is overruled.

The judgment of the trial court is affirmed.