ACCEPTED
08-18-00043-CV
EIGHTH COURT OF APPEALS
EL PASO, TEXAS
5/18/2018 12:06 PM
DENISE PACHECO
CLERK

# 08-18-00043-CV

No. 08-18-00043-CV

## COURT OF APPEALS FOR THE
## EIGHTH DISTRICT OF TEXAS

FILED IN
8th COURT OF APPEALS
EL PASO, TEXAS
5/18/2018 12:06:57 PM
DENISE PACHECO
Clerk

## EL PASO HEALTHCARE SYSTEM, LTD., dba
## Las Palmas Medical Center,

Appellant

v.

## SANTIAGO MONSIVAIS, Deceased By and Through His Next Friends
## Cinthia Monsivais and Samuel Monsivais and Cinthia Monsivais and
## Samuel Monsivais, Individually,

Appellees.

On Appeal from the County Court at Law No. 3
El Paso County, Texas
Cause No. 2017DCV1526

## APPELLEES' BRIEF

JOE P. LOPEZ, IV
State Bar No. 12566435
jlopez@jrlawfirm.com
RASANSKY LAW FIRM
2525 McKinnon, Suite 550
Dallas, Texas 75201
(214) 651-6100
(214) 651-6150 (Fax)

# TABLE OF CONTENTS

Table of Authorities                                    ii.

Statement of Facts                                      v.

Summary of the Argument                                 v.

Background                                              1

Argument                                                11

Conclusion                                              33

# TABLE OF AUTHORITIES

**Cases**

*Abshire v. HealthSouth Rehab. Hosp. of Beaumont, L.L.C.,*
No. 09-16-00107-CV Tex.App. LEXIS 2730, 2017,
WL 1181380 (Tex.App.—Beaumont March 30, 2017, pet. filed)    18, 24, 25

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,*
46 S.W.3d 873 (Tex.2001)    28, 31

*Blan v. Ali,* 7 S.W.3d 741(Tex.App.-Houston [14th Dist.] 1999, no pet.)    21

*Broders v. Heise,* 924 S.W.2d 148 (Tex. 1996)    22

*Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682 (Tex.2002)    22

*Certified EMS, Inc. dba CPNS Staffing v. Potts,*
392 S.W.3d 625 (Tex. 2013)    27, 28, 29, 30, 31, 32, 33

*Denton Reg'l Med. Ctr. V. La Croix*, 947 S.W.2d 941, 950
(Tex.App.—Fort Worth 1997, pet. denied)    20, 21, 23

*Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, (Tex.1985),
*cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)    22, 23

*Exxon Pipeline Co. v. Zwahr* 88 S.W.3d 623, 629 (Tex. 2002)    22

*Hall v. Huff,* 957 S.W.2d 90, 101 (Tex. App.-Texarkana 1997, pet. denied)    21

*Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex. 2001)    22

*Hood v. Phillips,* 554 S.W. 2d 160, 165 (Tex.1977)    21

*In re Jorden,* 249 S.W.3d 416, 421 (Tex. 2008)    32

*In Re McAllen Medical Center, Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) — 34

*Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010) — 11

*Loaisiga, v. Cerda* 379 S.W.3d 248 (Tex. 2012) — 32

*Methodist Hosp. v. German*, 369 S.W.3d., 333, 343 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) — 11, 12, 13, 14, 15

*Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011) — 31

*Reed v, Granbury Hosp. Corp.*, 117 S.W.3d 404, 415 (Tex.App.—Ft. Worth 2003, no pet.) — 18, 19

*Scoresby v. Santillan,* 346 S.W.3d 546, 554 (Tex. 2011) — 32

*TTHR Ltd. v. Moreno*, 401 S.W.3d 41 (Tex. 2013) — 26, 27, 28, 29

*Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex.1972) — 21

*Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex.2009) — 11

**Other Authorities**

Act of June 11, 2003, 78th Leg., R.S., Ch. 204, § 10.11(b)(1), (3), 2003 Tex. Gen. Laws 847, 884 — 31

*Texas Administrative Code* — 13

22 *Tex. Admin. Code* § 217.11 — 13, 14, 16, 17

*Medical Practice Act* §151.002(a)(13) — 23

*Tex. Civ. Pr. & Rem. Code* §51.014(a)(9) — 27

*Texas Hospital Law*: Liability & Damages §3.1.1 at 3-3 — 20, 21

*Texas Occ. Code,* Ann. §151.002(a)(13) (West Supp. 2016)    ……..14, 23, 26

*Tex. Occ.Code* Ann. §§ 301.001–301.3607
(West 2004 & West Supp. 2010)    13, 14

*Tex. Occ.Code* Ann. § 301.002(2) (West Supp. 2010)    … 14, 17

*Tex. Occ.Code.* § 301.004(b)    14

*Nursing Practice Act*; 22 *Tex. Admin. Code* §§ 213.1–227.6 (2010)    13

## STATEMENT OF FACTS

Appellees want to correct or clarify the following: Specifically, in Roman Numeral II of the Appellant's Statement of Facts, Appellant makes reference to Plaintiffs' Amended Original Petition. However, Plaintiffs (Appellees herein), previously filed a Second Amended Petition which is the live pleading in this case therein identifying RN Jimenez and Paramedic Bustos by name and adding a cause of action for Negligent Supervision and/or Control.

## SUMMARY OF THE ARGUMENT

As per Dr. Dallas Johnson's supplemental expert report, (CR 107-129), the standard of care was for all LPMC ED personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago. (CR119). The standard of care in emergency departments is to obtain and record a thorough and complete medical history. (CR 120).

As per Dr. Johnson's report, the standard of care required a thorough, accurate, and complete history and examination of all reasonable and pertinent information before proceeding with a diagnosis and treatment plan. (CR 127, 128). In addition, the standard of care required LPMC to conduct a through ( sic), detailed, and accurate analysis of all of the information available to the ED team. (CR 126).

## Background

In its brief, Appellant sets forth some (but not all) of the chronology of events which Appellant, hereinafter LPMC, encountered and what its non-physician employees and ER doctor did and/or did not do to care for the decedent, Santiago Monsivais. (Appellant's Brief pp. 1-3).

The Appellee's expert report however describes the actions and omissions of the hospital (LPMC). Specifically, *inter alia,* Santiago's mother, Mrs. Monsivais initially presented with Santiago at LPMC-ED at 0254 hours with Triage Level EST3/Urgent on February 20, 2015. (CR 116). At that time, RN Renato Jimenez noted the "stated complaint" as constipation and the chief complaint as "GI/Abdominal pain" but did not mention that Santiago had had history of trouble breathing only one day before when he had been seen by his pediatrician, Dr. Nicolas Rich, M.D. (CR 111). He was then seen initially at 3:01 a.m. by Michael Bustos, a Paramedic-Emergency Medical Technician. (CR 123), who likewise, did not document that Santiago had had history of trouble breathing only one day before when he had been seen by his pediatrician, Dr. Nicolas Rich, M.D. (CR 111).

According to the medical record, Mrs. Monsivais told Bustos that Santiago "was experiencing constipation with nausea and vomiting for the previous five hours and had two episodes of emesis" (i.e., vomiting). (CR 123). Bustos recorded

1

Santiago's "chief complaint" only as "abdominal pain," and at 3:14 a.m. reported that Santiago "was experiencing nausea, constipation that had been constant for [four to six] hours and feeding problems." (CR 123). Bustos also recorded that Santiago "had only one wet diaper in the previous [eight] hours." (CR 123). Following his physical examination of Santiago, Bustos reported "[b]owel sounds were not present and normal in all four quadrants and at the umbilicus." (CR 123-24). At 3:28 a.m., Bustos and Renato Jimenez, a Registered Nurse, reported that Santiago "was lying quietly with no cry." (CR 124). Dr. Michael Payne was the Emergency Department physician who saw Santiago at Las Palmas. In his Emergency Provider Report Dr. Payne recorded much of the same information recorded by Bustos, but added that Santiago was exhibiting "fussiness" and was "crying more." (CR 124. Likewise, Dr. Payne's report did not indicate Santiago had been seen the previous day by Dr. Rich. Dr Payne diagnosed Santiago as suffering from infantile colic and discharged him. (CR 117, 123). Santiago was discharged from Las Palmas at 3:49 a.m. on February 20. (CR 116).

Unfortunately, Santiago's condition continued to deteriorate, and Mrs. Monsivais took him to Providence Memorial Hospital, where he was admitted at 6:56 a.m. (CR 119). Santiago died later that night at 10:51 p.m. The cause of death

2

was "cardiogenic shock from severe sepsis, secondary to Streptococcus agalactiea, otherwise known as Group B Strep or GBS." (CR 119).

## Dr. Dallas Jonson's Supplemental Expert Report

As per Dr. Dallas Johnson's supplemental expert report, (CR 107-129), the standard of care was for all LPMC ED personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago. (CR119). And, the standard of care in emergency departments is to obtain and record a thorough and complete medical history. (CR 120).

As per Dr. Johnson's report, the hospital records reflect that Santiago presented with a significant medical history. He was born a very healthy normal infant 16 days before presenting to LPMC. Less than 15 hours before presenting to LPMC he began to experience changes in his normal behavior. These changes. as reported by his mother, included decreased bowel and bladder function, emesis, and difficulty breathing. (CR 119). When a patient, particularly an infant barely two weeks old, presents with significant signs and symptoms that are not improving, signs and symptoms that were concerning enough for his mother to seek medical care a second time in 12 hours, an abundance of caution is required and is the standard of care. Common sense tells us when there has been no treatment and a child's medical condition is not getting better there is something wrong with the child

3

and it is incumbent on medical professionals to make every reasonable effort to determine the cause of the complaints, why they have persisted, and to begin treatment. Doing nothing meaningful caused Santiago's death.

As per the Appellee's expert report, the standard of care in emergency departments in which Dr. Johnson has worked, is to obtain and record a thorough and complete medical history. (CR 120). In the setting of a very young infant it is prudent to consider a significant problem exists until reasonable diagnostic efforts show that it does not exist. When the child's medical history reveals signs and symptoms incompatible with a healthy two week old infant such as absence of multiple bowel movements in multiple hours in a 100% breast-fed infant, a single wet diaper in more than 8 hours, emesis (a mother who has been nursing her child for all of its life knows the difference between spitting up with burping and vomiting) are not signs of a well baby. (CR 119, 120).

As per Dr. Johnson, every person from the intake and receiving personnel who heard Ms. Monsivais state why she brought her infant to the Emergency Department to the educator who instructed Ms. Monsivais on care of Santiago once discharged as well as those persons who carried out the patient's discharge from the ED to home were employees of LPMC. (CR 121). LPMC acting through it employees had a duty to provide adequate, timely and proper care to Santiago. The standard of care

4

required (1) a thorough and accurate medical history, (2) a physical examination of Santiago with reporting of pertinent findings, (3) laboratory studies to evaluate the infant for otherwise unseen signs to explain his symptoms, (4) development of an assessment and differential diagnosis that used all the information previously obtained to arrive at a reasonable explanation of and (5) treatment (blood work including CBC with differential, CRP, and gram stain-IV, and antibiotics (penicillin), and the administration of IV fluids) for the condition that brought Santiago to LPMC.  (CR 121, 122).  (It is noted that generally, only the physician could diagnose Santiago's condition and order tests).

In any event, and notwithstanding the foregoing, as per Dr. Johnson, the medical history taken by LPMC was deficient in that it made no mention of the fact Santiago had been seen by a board-certified pediatrician less than 12 hours prior to his arrival at LPMC with no improvement in the same symptoms for which he was seen by that pediatrician. This was a significant error because it established a firm time line for Santiago's symptoms and the fact they were continuing unabated and untreated. This was notice to the LPMC ED staff to be on high alert that something was continuing to change this infant's behavior and the standard of care was for LPMC to make every reasonable effort to determine what that something was and

to treat it. A cursory and inadequate examination of Santiago was conducted and the findings were abnormal. (CR 122).

In addition, the observation that the child was "lying quietly without crying" by Bustos and Jimenez is inconsistent with a diagnosis of infantile colic. (CR. 122). No fever was reported but, LPMC personnel failed to determine if Santiago's vital signs were changing during his 55 minute stay at LPMC because the only VS recorded were those at the time of presentation to LPMC. (CR 122). The standard of care for the history and examination alone required more investigation of this infant. (CR 122).

If the LPMC ED team arrived at the diagnosis of infantile colic independently it was incumbent on individuals who examined Santiago including but not limited to Paramedic Bustos and Nurse Jimenez to document the other possible diagnoses associated with Santiago's signs and symptoms including the possibility of a serious condition including the early stages of an infection. However, they did not and instead went on to support the incorrect diagnosis of infantile colic.

The failure to document the fact Santiago was seen by his pediatrician, Dr. Nicolas Rich, 12 hours earlier with the same complaints but who had diagnosed him with jaundice, with no improvement, was a breach of the standard of care. (CR 122 and RR Vo.2, page 16, line6-10). The failure to adequately observe and record serial

VS on an infant who was not improving was a breach of the standard of care. (CR 123). The failure to adequately observe the infant for further evaluation was a breach of the standard of care. (CR 123). The failure of LPMC ED personnel, including but not limited to, Bustos and Jimenez to consider anything but a benign diagnosis that was not supported by the available evidence was a breach of the standard of care. These breaches of the standard of care resulted in Paramedic Bustos and Nurse Jimenez, with Dr. Payne's approval, to send Santiago home with instructions and advice for Ms. Monsivais for a completely benign condition that Santiago did not have and completely ignore a very serious condition Santiago did have, namely GBS disease. (CR 123)

Appellee's expert also points out glaring differences between the reports of Bustos and Jimenez and those of Dr. Payne which would lead a person to believe that they were describing completely different patients. (CR 124). As per Appellee's expert, this is clearly below the standard of care that requires accurate, thorough, and complete medical information prior to providing care to a patient. (CR 124). For example, Appellee's expert points out that Santiago's medical records indicate that he was afebrile, as per Bustos and Jimenez, when he arrived at the LPMC ED. (CR 125). However, Santiago's temperature was not recorded by Bustos or Jimenez when he was discharged to home from the LPMC ED which was a breach

of the standard of care. (CR 125). In addition, at the time of discharge, Renato Jimenez, RN saw the infant and obtained a heart rate that showed a pulse increase from 127 bpm to 144 bpm from vital signs obtained 47 minutes earlier. This increase in heart rate was an additional indicator that something of concern was occurring to Santiago and he had a much more serious condition than infantile colic. An increase in heart rate is associated with increasing body temperature as in a fever associated with a bacterial infection such as GBS disease. Ms. Monsivais informed Paramedic Bustos that her infant was ill. She stated he was not urinating or emptying his bowels as he normally did and he had two episodes of emesis. Santiago was a 100% breast-fed infant and such infants have very soft and abundant stool and very rarely become constipated. This information was passed on to LPMC personnel as part of Santiago's history. They took this information as well as the information he obtained from examining Santiago to form an opinion about Santiago's medical condition otherwise known as a clinical impression. This clinical impression and the information included in the patient's medical record led Nurse Jimenez to enter a diagnosis (primary impression) of infantile colic, a benign and self-limiting newborn condition. (CR 125, 126).

Santiago's medical record does not support a diagnosis of a benign and self-limiting newborn condition. However, his medical record contains several elements,

8

including significantly decreased bowel and bladder activity, breathing difficulties, absent bowel sounds, lethargy, and emesis that should cause prudent physicians and Emergency Department personnel to seriously consider this infant has a condition more serious than colic such as a serious infection like GBS. (CR 126).

Again, the standard of care required LPMC to conduct a thorough, detailed, and accurate analysis of all of the information reasonably available to the ED team. (CR 126).

The diagnosis of infantile colic also led to teaching by Nurse Jimenez to Ms. Monsivais about managing infantile colic when her child actually had a much more serious condition, GBS. (CR 126).

Actions by the LPMC ED personnel led to decisions about disposition of the child and the educational information to be provided to Ms. Monsivais regarding the care of Santiago following his discharge to home. The educational material (including but not limited to, the "Discharge Instructions" which was provided to Ms. Monsivais, was specifically for infantile colic and made no mention of warnings, signs, symptoms and necessary actions for a more serious condition such as GBS. In fact, LPMC's standard Discharge Instructions stated that the fussiness and crying were a "completely normal pattern." LPMC's Discharge Instructions went on to state that a medical exam would help determine the causes of most

"colicky babies," and that in most cases, there is nothing physically or emotionally wrong with the baby (or the parents). LPMC's Discharge Instructions went on to provide instruction to the parent regarding feeding methods and changes in diet only. The Discharge Instructions also instructed the parent to return or to contact a doctor if the child experienced certain specified symptoms such as: poor feeding, repeated vomiting, unexpected changes in crying pattern or behavior, suspected abdominal pain, etc. The LPMC record clearly shows that Santiago was exhibiting all of the foregoing symptoms and complaints while at LPMC; yet, LPMC did nothing to address the complaints and symptoms. LPMC grossly mishandled and mismanaged Santiago's care and breached the standard of care, which proximately caused his death. LPMC ED personnel who examined and treated Santiago did not utilize the information reasonably available to them including, but not limited to, the patient's history of present illness and chief complaint.

As per Dr. Johnson's report, the standard of care required a thorough, accurate, and complete history and examination of all reasonable and pertinent information before proceeding with a diagnosis and treatment plan. (CR 127, 128).

**<u>Argument</u>**

**1. The Appellee's Expert Report Does <u>Not</u> Impose a Higher Standard of Care Than That Allowed by Law.**

Challenges to expert opinions ordinarily arise in the context of rulings on their admissibility, which are reviewed for an abuse of discretion. See *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex.2009). While it may be true that is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury, proximate cause need not be proven by expert testimony if it involved a case of "common sense." *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). In any event, Appellant herein does not raise the issue of proximate cause in its brief and therefore, it need not be addressed any further other than to point out that the case at bar is a case involving "common sense." Doing nothing to address the patient's dire condition is not the standard of care required of Appellant LPMC and its employee staff but, that is exactly what LPMC did, nothing. (RR Vol. 2, page 23, lines 4-7).

The Appellant argues that the bounds of the standard of care are set by legislation and regulation promulgated by licensing board and that therefore, an expert cannot impose a higher standard of care upon a health care provider than what the law allows. (Appellant's Brief @ 9 citing *Methodist Hosp. v. German*,

369 S.W.3d., 333, 343 (Tex. App.—Houston [1ˢᵗ Dist.] 2011, pet. denied). That case is inapposite to the case at bar.

*German* was a medical malpractice case against a hospital involving the care provided by its nurses. Appellee John German was admitted to Methodist Hospital for surgery to repair a congenital heart defect. A tragic surgical error committed during his first heart surgery required additional surgeries and interventions. German survived, but only after suffering the amputation of one leg, one foot, and most of his fingers. German filed suit to recover damages for injuries arising from the original surgery and his subsequent course of treatment. After settling with his doctors, he proceeded to trial against the sole remaining defendant, the Methodist Hospital. German sought to hold Methodist responsible for the acts of its nurses, alleging that the nurses failed to notice that he was having a dangerous reaction to medication, and that their failure to take appropriate action led to the eventual amputations. German also alleged that Methodist did not properly train its nurses to recognize and appropriately respond to his symptoms. *German* at 333.

The jury awarded damages to German based on findings that Methodist was negligent and was 50% responsible for the injuries. The jury also found that the hospital had acted with conscious indifference in providing medical care and awarded exemplary damages. The trial court entered judgment on the verdict in

12

German's favor. Among other things, the hospital contends on appeal that the evidence was legally insufficient to support the verdict, primarily because critical testimony by German's expert witness was unreliable and conclusory. *German* at 333.

As to the theory based on the nurses' alleged failures, Methodist argued that a critical component of German's proposed standard of care conflicted with Texas law by effectively requiring the nurses to *diagnose* German's symptoms as HIT, and therefore the proposed standard was not supported by any legally sufficient evidence. (Emphasis added). *German* at 338.

The *German* court pointed out that German's expert witness "could not testify that the nurses should have *diagnosed* HIT." *German* at 339.

As per the opinion in *German,* both Methodist and German relied on the *Nursing Practice Act* and its implementing regulations in the *Texas Administrative Code* as defining the standard of care for nurses applicable to that case. See *Tex. Occ.Code* Ann. §§ 301.001–301.3607 (West 2004 & West Supp. 2010) (*Nursing Practice Act*); 22 *Tex. Admin. Code* §§ 213.1–227.6 (2010). Rule 217.11 of the *Texas Administrative Code*, entitled "Standards of Nursing Practice," defines the "minimum acceptable level of nursing practice" for a given setting. See 22 *Tex. Admin. Code* § 217.11. Among the standards applicable to all nurses are the

13

requirements that a nurse know the rationale for, and effects of, medications and treatments and correctly administer them, *as well as, accurately and completely reporting the patient's signs, symptoms, and responses*. Id. § 217.11(1)(C), (D). (Emphasis added). *German* at 340.

In defining "professional nursing," the *Nursing Practice Act* specifically excludes "acts of medical diagnosis." *Tex. Occ.Code* Ann. § 301.002(2) (West Supp. 2010). Furthermore, the Act specifically states that it "does not authorize the practice of medicine as defined by Chapter 151" of the *Occupations Code*. See id. § 301.004(b). The *Medical Practice Act* defines "practicing medicine" to include "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." Id. §151.002(a)(13). Medical diagnosis is commonly understood to be the determination of the cause and nature of a patient's condition. *German* at 340. Both Methodist and German agreed that nurses cannot legally make medical diagnoses. *German* at 340.

The court in *German* held that "German offered no evidence of any standard of care effectively requiring the nurses to *diagnose* HIT. (Emphasis added). *German* at 343. The *German* court went on to state that "This holding does *not* mean that a

14

nurse has no duty to recognize and appropriately report or otherwise act on the signs and symptoms of a dangerous allergic reaction." *German* at 343. (Emphasis added).

It is interesting to point out that, as per the Texas Department of State Health Services, the "Nursing Standards of Care" as defined therein, "pertain to professional nursing activities that are demonstrated by the nurse through the nursing process. These involve assessment, ***diagnosis***, outcome identification, planning implementation, and evaluation. The nursing process is the foundation of clinical decision making and encompasses all significant action taken by nurses in providing care to all consumers." (September 1, 2004). (Emphasis added). It uses the word "diagnosis" as part of "professional nursing activities."

In addition, Section 217.11 of the Texas Administrative Code; Standards of Nursing Practice, provides in relevant part that:

> The Texas Board of Nursing is responsible for regulating the practice of nursing within the State of Texas for Vocational Nurses, Registered Nurses, and Registered Nurses with advanced practice authorization. The standards of practice establish a minimum acceptable level of nursing practice in any setting for each level of nursing licensure or advanced practice authorization. Failure to meet these standards may result in action against the nurse's license even if no actual patient injury resulted.
>
> The relevant portions of that section provide as follows:
>
> (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall:
>
> …

(F) Promote and participate in education and counseling to a client(s) and, where applicable, the family/significant other(s) based on health needs;

(H) Make a reasonable effort to obtain orientation/training for competency when encountering new equipment and technology or unfamiliar care situations;

(M) Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications;

(N) Clarify any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment;

(P) Collaborate with the client, members of the health care team and, when appropriate, the client's significant other(s) in the interest of the client's health care.

In addition, the *Texas Occupations Code*, Section 301.002 states in relevant part that:

(2) "Professional nursing" means the performance of an act that requires substantial specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of professional nursing. The term does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures. Professional nursing involves:

(A) the observation, assessment, intervention, evaluation, rehabilitation, care and counsel, or health teachings of a person who is ill, injured, infirm, or experiencing a change in normal health processes;

(B) the maintenance of health or prevention of illness.

16

In the case at bar, the acts of Nurse Jimenez should have included the observation, assessment, intervention, evaluation, rehabilitation, care and counsel, of Santiago. In addition, "health teachings" as contained in (2)(A) above, included the teaching in the case at bar to Ms. Monsivais by Nurse Jimenez of LPMC in the Discharge Summary about "infantile colic" (although Santiago was *not* afflicted with that condition).

Appellant wants this Court to conclude that Appellee was *requiring* LPMC to make *diagnoses*. That is simply not true. Having said that, it is incumbent on the non-physician personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago (CR119) and to obtain and record a thorough and complete medical history. That being said, the standard of care which is set forth repeatedly by the Appellee's expert was for LPMC and its ED personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago (CR119) and to obtain and record a thorough and complete medical history (CR 120, 121). The standard of care for the history and examination alone required more investigation of this infant. (CR 122). The standard of care also required accurate, thorough, and complete medical information prior to providing care to a patient. (CR 124). Therefore, in view of the foregoing argument and authorities, Dr. Johnson's report does not impose a higher standard of care than that allowed by law.

17

## II.

### Dr. Johnson's Supplemental Report Which Sets Forth a Standard of Care for Las Palmas' Non-Physician Staff Does Not Amount to the Practice of Medicine

Appellant argues that a hospital cannot practice medicine and may not be held liable for functions that require the practice of medicine. (Citing *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 415 (Tex.App.—Ft. Worth 2003, no pet.) and *Abshire v. HealthSouth Rehab. Hosp. of Beaumont, L.L.C.,* No. 09-16-00107-CV Tex.App. LEXIS 2730, 2017, WL 1181380, at *43 (Tex.App.—Beaumont March 30, 2017, pet. filed). Appellee incorporates the arguments and authorities set forth in Roman Numeral I above, as if set forth herein at length.

In Roman Numeral II of its brief, Appellant argues that Dr. Johnson's Supplemental Report which sets forth a standard of care for Las Palmas' non-physician staff amounts to the practice of medicine. Furthermore, Appellant claims that Jimenez and Bustos and other "unidentified personnel" failed to, diagnose, order tests, and treat Santiago. What Dr. Johnson actually said in part, *inter alia*, was that standard of care was for LPMC ED personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago. (CR119). Two of the "personnel" that Dr. Johnson was obviously referring to were EMT Bustos and RN Jimenez. The only other person whom Dr. Johnson referred to in his report was the

"intake person," who was not named by LPMC, and, whom Dr. Johnson opined, should have taken an accurate, thorough, and complete medical history. In addition, defense counsel for LPMC represented to the trial court at the February 23, 2018, hearing that Dr. Johnson did not identify the LPMC to whom he is referring in his report. (RR Vol 3, page 16, lines 8-11). On the contrary, the Plaintiffs' expert report is replete with the identification of the LPMC personnel. (CR 120, 122, 123, 124, 125, 126). This matter was raised by Plaintiffs' counsel at RR Vol. 3, page 30, line 2 – page 32, line 4.

Appellant cites this Court to the case of *Reed v. Granbury Hosp. Corp.* 117 S.W.3d 404 (Tex.App.—Ft. Worth 2003, no pet.) for the proposition that a hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions.

That case involved an individual (Mr. Reed) who had suffered stroke-like symptoms and was taken to the hospital. A registered nurse had recently heard on a television documentary program that the drug t-PA could be used as a clot-busting treatment for stroke if administered within three hours after a stroke. At the Hospital, Mrs. Reed told Dr. Don Davis, the emergency-room physician, that she had heard about t-PA and, "if possible, [she] wanted Jess to get this." On the date of Mr. Reed's stroke, the Hospital had t-PA available and also had a written policy allowing its

19

administration to cardiac patients. The Hospital did not, however, have a protocol for administering t-PA to stroke victims, and it had no written standard of care for stroke patients. Dr. Davis testified that, although he did not rely on the Hospital to advise him regarding what medical treatments were appropriate for a patient, including Mr. Reed, he did not consider administering t-PA to Mr. Reed without a Hospital protocol. The Reeds sued the Hospital for negligence in the medical treatment Mr. Reed received. The *Reed* case involved policies and procedures of a hospital.

Contrary to the appellant's position, in the instant case, a hospital may in fact, be liable for injuries arising from the negligent performance of a duty that the hospital owes *directly* to a patient. *Denton Reg'l Med. Ctr. v. La Croix*, 947 S.W.2d 941, 950 (Tex.App.—Fort Worth 1997, pet. denied). (Emphasis added). One such duty is the duty to use reasonable care in formulating the policies and procedures that govern the hospital's medical staff and non-physician personnel. *Id.* The test used to determine the standard of care a hospital is required to use in formulating its policies and procedures is what a hospital of ordinary prudence would have done under the same or similar circumstances. *LaCroix,* 947 S.W.2d at 950; *Texas Hospital Law*: Liability & Damages §3.1.1 at 3-3. Circumstances to be considered include, but are not limited to, the expertise of, and means available to, the hospital

and the state of medical knowledge. *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977). Expert testimony is generally required to establish the governing standard of care and to determine whether the standard has been breached. *Id.* at 165-66; *LaCroix,* 947 S.W.2d at 950. While the standard of administrative care at a hospital may be established by lay testimony, medical expert testimony is required where the underlying issue involves the performance of medical procedures. *LaCroix,* 947 S.W.2d at 950-51; *Texas Hospital Law*: Liability & Damages § 3.1.2 at 3-5.

There are certain standards universally regarded as ordinary medical standards beneath which no common or community standards may fall. *Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex.1972). This is because universality of education, training, testing, and travel in the realm of medical treatment have produced a correspondent right to expect the same basic quality of care from region to region. *Hall v. Huff,* 957 S.W.2d 90, 101 (Tex. App.-Texarkana 1997, pet. denied). These universal standards apply to multiple schools of practice and to any medical doctor. *Blan v. Ali,* 7 S.W.3d 741, 746 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

In the case at bar, LPMC can be held directly liable for the acts and omissions of its non-physician personnel, such as nurse Jimenez, EMT Bustos, and/or the intake person. Among other things, as the medical records confirm, those

21

individuals, which the hospital employed, did not record/take an accurate or complete medical history, did not perform more than one set of vitals, did not properly adequately observe Santiago, did not adequately examine Santiago, and did not properly evaluate Santiago, and did not document that Santiago had had history of trouble breathing only one day before when he had been seen by his pediatrician, or that Santiago had been seen by his pediatrician less than 12 hours before his mother brought Santiago to LPMC. (CR 119-129). Those failures, among others as set forth in Dr. Johnson's supplemental report, proximately caused the death of Santiago. (CR 128).

The trial court has broad discretion to determine admissibility, and an appellate court will not reverse the trial court's ruling absent a clear abuse of that discretion. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499; *Broders v. Heise,* 924 S.W.2d 148, 151. A trial court abuses its discretion only if it acts arbitrarily and capriciously, without reference to any guiding rules or principles. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in

a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 242.

Dr. Johnson set forth his experience and familiarity and special knowledge with regard to about what protocols, policies, or procedures a hospital of ordinary prudence, would have had in place for it and its staff and what it and its staff should have done. (CR 107-109). Again, if the subject matter is common to, and equally recognized in, all fields of practice, any physician familiar with the subject may testify regarding the standard of care.

Interestingly, in its brief, Appellant does not set forth what it thinks the standard of care is. It only seems to maintain that whatever the standard of care is, the hospital cannot be held directly liable for a breach of it. While a hospital's internal policies and procedures do not, alone, determine the standard of care, they may be considered in determining that standard. *La Croix*, 947 S.W.2d at 951.

Although it may be the case that medical *decisions* are to be made by attending physicians and that a hospital cannot practice medicine, (Tex. Occ. Code, Section 151.002(a)(13)), the actions of RN Jimenez and of EMT Bustos, as well as its intake staff, did not entail making medical *decisions* or the diagnosis, treatment, or offer to treat a physical disease, disorder, or injury. (RR Vol. 2, page 15, lines 5-15). On the contrary, the facts confirm that Nurse Jimenez, EMT Bustos, and the intake staff,

23

did not make any medical *decisions*. But, what little they did do, they did so inadequately and incompletely. (CR 119-129).

Appellant also cites the court to the case of *Healthsouth Rehab. Hosp. of Beaumont and Christus Healthsouth Southeast Texas dba Christus Hospital-St. Elizabeth v. Abshire*, 2017 WL 1181380 (Tex.App.—Beaumont, March 30, 2017, pet. filed). That was a case involving an accelerated appeal from the trial court's order overruling the defendants' objections to plaintiff's expert reports and denying a motion to dismiss plaintiff's health care liability claim. *Abshire at *1*. Abshire alleged, as to Christus Hospital, that the health care professionals there who attended to the patient failed to recognize the signs and symptoms of a spinal compression fracture resulting in a delay in treatment which caused Ms. Abshire's paraplegia. They also missed the history of osteogenesis imperfecta that predisposes one to fractures.

The Plaintiffs in *Abshire* produced an expert report setting forth the standard of care which required Christus to: (1) evaluate the cause of Abshire's pain, (2) examine her back for musculoskeletal problems, (3) consider her relevant prior medical history, (4) recognize signs and symptoms indicating a compromise of the musculoskeletal system in Abshire's neck, shoulders, and back, and (5) institute early stabilization of the spine prior to the establishment of paraplegia. *Abshire @*3.*

A hearing was thereafter held on the objections to the expert's report. The court found that although Dr. Rushing's report was a good faith effort to comply with Chapter 74, it did not comply with the requirements of the statute and granted an extension of time to supplement the expert report. *Abshire @\*5.*

The purpose of Appellant citing the *Abshire* case seems to be to make the point that allegedly "a hospital may not be held liable for functions that require the practice of medicine." (Appellant's brief at page 9). That alleged verbiage however, was merely an argument made by Christus Hospital in the *Abshire* case and in any event, is NOT what the Christus argument was. Christus's argument was that "a hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions." *Abshire* at *9.

The trial court in *Abshire* concluded that "Dr. Rushing's qualifications were adequate because Rushing had supervised nurses for a fifteen-year period, had participated in setting medical policy at hospitals, and Rushing oversees rehabilitation efforts of his patients. The trial court wrote that Dr. Rushing had stated that the standard of care for the nurses at Christus was "to accurately assess, document and communicate matters to the physician[ ]" and Dr. Rushing cited "numerous examples" of a failure of the nursing staff to do so." *Abshire* @ 9.

25

*Texas Occ. Code*, Ann. §151.002(a)(13) (West Supp. 2016) defines "practicing medicine" as the diagnosis, treatment, or offer to treat a physical disease, disorder, or injury by a licensed physician or surgeon.

In the instant case, neither Nurse Jimenez or EMT Bustos (or the hospital's intake staff for that matter) diagnosed, treated, or offered to treat Santiago. This is contrary to what defense counsel Norton argued to the trial court. As Dr. Johnson set forth in his reports, and as stated hereinabove, the standard of care was to properly and completely assess, evaluate, observe, and examine Santiago, and to take more than one set of vital signs, and to take an accurate or complete medical history, and to document that Santiago had had history of trouble breathing only one day before when he had been seen by his pediatrician. (CR 119, 120).

Appellee's expert repeatedly sets forth the standard of care for the hospital and its non-physician staff. Appellant, on the contrary did not, not even once, set forth what it believes to be the SOC which is applicable to it. Of course, if you believe LPMC, maybe the standard of care was for it was to do exactly what it and its employees did for the decedent, to wit, nothing, other than to discharge him with a diagnosis of infantile colic.

A case which Appellant believes to be relevant is the case of *TTHR Ltd. v. Moreno*, 401 S.W.3d 41 (Tex. 2013), which involved a suit against a hospital and

two doctors. Plaintiff alleged that the hospital was liable for the injuries to F.C. because of its own *direct* negligence, as well as, its vicarious liability for the negligence of its nurses and the two doctors. *Moreno* at 43. The hospital objected to the adequacy of the experts' two reports and the trial court sustained same. The Plaintiff was given a thirty-day extension to cure the reports. The Plaintiff then filed a report of a pediatric neurologist, to which the hospital also objected. The trial court determined that when the three reports were read in concert, Moreno had met the TMLA's requirements. It denied the hospital's motion to dismiss, and an interlocutory appeal followed. *See* Tex. Civ. Pr. & Rem. Code §51.014(a)(9). The court of appeals affirmed as to the adequacy of the reports regarding Moreno's claim that Presbyterian was vicariously liable for the doctors' negligence but, in addressing the direct liability claims, the court concluded that one of the expert's report did not adequately address the applicable standards of care or how Presbyterian breached those standards, and neither of the reports of the other two experts addressed any standard or breach by the hospital. *Moreno* at 43, 44. The court remanded the case to the trial court and instructed it to consider granting Moreno a thirty-day extension to cure the deficiencies found on appeal.

After the Supreme Court heard oral argument in that case, it then held in *Certified EMS, Inc. dba CPNS Staffing v. Potts*, 392 S.W.3d 625 (Tex. 2013) that

the TMLA does not require an expert report for each liability theory pleaded against a defendant. *Certified EMS, Inc.,* 392 S.W.3d at 632. The Court went on to state that "our decision in that case controls the outcome here because we conclude that Moreno's expert reports addressing the hospital's alleged liability for the actions of Drs. Wilson and Gore-Green are adequate." *Moreno* at 44.

The Supreme Court agreed with the court of appeals which held that the trial court did not abuse its discretion by finding Moreno's reports adequate as to the claim that the hospital was vicariously liable for the negligence of the doctors. *Moreno* at 44. The court of appeals' review of the trial court's ruling was under the abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001).

The Supreme Court went on to state that "as we articulated in *Certified EMS,* the TMLA requires a claimant to timely file an adequate expert report as to each defendant in a health care liability claim, but it does not require an expert report as to each liability theory alleged against that defendant. *Certified EMS, Inc.,* 392 S.W.3d at 632." (See also RR Vol 2, page 31, lines 20 - page 32, line 1). *Potts* went on to state that "[H]ere, because the trial court did not abuse its discretion in finding Moreno's reports adequate as to her theory that Presbyterian is vicariously liable for the doctors' actions, her suit against Presbyterian — including her claims that the

28

hospital has *direct* liability and vicarious liability for actions of the nurses — may proceed. *See id.* at 632." *Moreno* at 45.

*Potts* was a case in which a patient alleged that a hospital nurse, who was temporarily placed with the hospital by a staffing service, assaulted her. The patient sued under the Texas Medical Liability Act, asserting that the staffing service was directly and vicariously liable for the nurse's conduct. The staffing service sought dismissal because the patient's expert reports did not specify how the service was directly negligent. *Potts* at 626. The trial court denied the motion to dismiss, and the court of appeals affirmed. It held that because the reports support a theory of vicarious liability against the staffing service, the lack of a description supporting direct liability is not fatal to the claimant's maintaining her cause of action. The Supreme Court agreed with the court of appeals, but for different reasons. *Potts* at 626.

Potts claimed that Certified EMS was directly liable for Nurse Hardin's conduct because it failed to properly train and oversee its staff, enforce applicable standards of care, and employ protocols to ensure quality patient care and adequate staff supervision.

Similarly, in the case at bar, in Plaintiffs' Second Amended Original Petition, which Plaintiffs ask the Court to take judicial notice of, Plaintiffs pled "negligent

supervision and control." (Suppl. CR Vol. 1, p. 14). Plaintiffs alleged therein that "Defendant Las Palmas Medical Center owed Plaintiffs a legal duty to hire and supervise and/or control competent workers to do perform the functions in its emergency department. Defendant Las Palmas Medical Center breached those duties by hiring and/or by failing to supervise and/or adequately supervise its workers, which proximately caused the damages and injuries to the plaintiffs for which plaintiffs seek compensation." (Suppl. CR Vol. 1, p. 14).

In the *Potts* case, Certified EMS challenged the reports and the court gave Potts thirty days to cure the deficiencies. Certified EMS objected to the newly submitted reports and moved to dismiss on numerous grounds, among them, that the reports omitted any explicit reference to Certified EMS's direct liability for Hardin's conduct. The trial court denied the motion, and Certified EMS appealed. The court of appeals affirmed, holding that "if the claimant timely serves an expert report that adequately addresses at least *one* liability theory against a defendant health care provider, the suit can proceed, including discovery, without the need for every liability theory to be addressed in the report." (Emphasis added). The Supreme Court granted Certified EMS's petition for review, which raised a single issue: Must a claimant in a health care liability suit provide an expert report for each pleaded liability theory? 55 Tex. Sup. Ct. J. 461 (Mar. 30, 2012).

A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue. *Potts (*citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex. 2001)), which recognized that an expert report does not require litigation-ready evidence. Rather, "to avoid dismissal ... [t]he report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* and RR Vol. 2, page 17, lines 18 – page 19, line 14. For the particular liability theory addressed, the report must sufficiently describe the defendant's alleged conduct. Such a report both informs a defendant of the behavior in question and allows the trial court to determine if the allegations have merit. If the trial court decides that a liability theory is supported, then the claim is not frivolous, and the suit may proceed. *Potts* at 631.

The *Potts* court stated that "[t]his approach is consistent with the Legislature's intent. *See Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). ("Our primary objective in construing statutes is to give effect to the Legislature's intent."). In amending the Act, the Legislature sought to reduce "the excessive frequency and severity of ... claims," but to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), (3), 2003 Tex. Gen. Laws 847, 884. In

accordance with this goal, we have opined that one purpose of the report requirement is "to expeditiously weed out claims that have <u>no</u> merit." *Loaisiga, v. Cerda* 379 S.W.3d 248, 263. (RR Vol. 2, page 19, lines 22-24). (Emphasis added). We have also stated that the purpose of evaluating expert reports is "to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby v. Santillan,* 346 S.W.3d 546, 554 (Tex. 2011); *see also Loaisiga,* at 258 (recognizing that the expert report "requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed"); *In re Jorden,* 249 S.W.3d 416, 421 (Tex. 2008)." *Potts* at 631.

To require an expert report for each and every theory would entangle the courts and the parties in collateral fights about intricacies of pleadings rather than the merits of a cause of action, creating additional expense and delay as trial and appellate courts parse theories that could be disposed of more simply through other means as the case progresses. *Cf. Scoresby,* 346 S.W.3d at 549 (applying a "lenient standard" to a plaintiff's right to cure a deficient report, noting that approach "avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous"). *Potts* at 631.

The Supreme Court also pointed out that while a full development of all liability theories may be required for pretrial motions or to convince a judge or jury

32

during trial, there is no such requirement at the expert report stage. *See Palacios*, 46 S.W.3d at 879. *Potts* at 632.

The Act requires the expert report to summarize the expert's opinions "as of the date of the report," recognizing that those opinions are subject to further refinement. CPRC§74.351(r)(6). Discovery can reveal facts supporting additional liability theories, and the Act does not prohibit a claimant from amending her petition accordingly. Under *Potts'* reasoning, a claimant would have to serve an expert report each time a new theory is discovered. Not only would that be impractical, it would prohibit altogether those theories asserted more than 120 days after the original petition was filed — effectively eliminating a claimant's ability to add newly discovered theories. *Potts* at 632. In sum, an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case. To the extent other cases hold differently, we disapprove of them. *Potts* at 632.

## III.

## CONCLUSION

The Nightingale Pledge's first principle, to do no harm, is directly related to the nurse's duty to protect the patient's safety. Born out of the hipocratic oath, this principle dictates that "we do not cause injury to our patients."

Likewise, the EMT Code of Ethics provides in relevant part: A fundamental responsibility of the Emergency Medical Technician is to conserve life, to alleviate suffering, to promote health, to do no harm, and to encourage the quality and equal availability of emergency medical care.

Lastly, the standard of care for a hospital is "what an ordinary prudent hospital would do under the same or similar circumstances." *In Re McAllen Medical Center, Inc.*, 275 S.W.3d 458, 463 (Tex. 2008).

It's a sad day when a new first-time mother takes her 15-day old infant who was born healthy, to Las Palmas Medical Center (LPMC) complaining that her son has been suffering from trouble breathing (which was not documented by either the LPMC intake person, or by RN Jimenez, or by EMT-P Bustos, or by any other LPMC employee), was experiencing constipation with nausea and vomiting for the previous five hours, has had two episodes of emesis, has been experiencing feeding problems, has had only one wet diaper in the previous eight hours, and who has been seen by his pediatrician only 12 hours before for substantially the same symptoms (which was also not documented by either the LPMC intake person, or by RN Jimenez, or EMT-P Bustos), is nevertheless discharged from Las Palmas with a diagnosis of infantile colic, and is then taken by his mother to Providence Memorial Hospital, where he is admitted but who dies that night from cardiogenic shock from

severe sepsis, secondary to Streptococcus agalactiea, otherwise known as Group B Strep or GBS.

Although it this writer's opinion that "common sense" plays a major role in this case, Dr. Johnson's reports adequately and repeatedly set forth the appropriate standard of care applicable to LPMC.

WHEREFORE, PREMISES CONSIDERED, the Court should affirm the trial court's order overruling Las Palmas' objections to Dr. Johnson's supplemental report and for such other and further relief to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

**RASANSKY LAW FIRM**

*/s/ Joe P. López, IV*

**JEFFREY H. RASANSKY**
State Bar No. 16551150
jrasansky@jrlawfirm.com
**JOE P. LÓPEZ, IV**
State Bar No. 12566435
jlopez@jrlawfirm.com

2525 McKinnon, Suite 550
Dallas, TX 75201
Telephone:  (214) 651-6100
Facsimile:  (214) 651-6150

**ATTORNEYS FOR APPELLEES**

## CERTIFICATE OF COMPLIANCE

The foregoing Appellee's Brief complies with the type volume limitations of Rule 9.4(i)(2)(B) of the Texas Rules of Appellate Procedure because it contains 8,120 words, excluding those parts of the brief exempted by Rule 9.4(i)(1).

/s/ Joe P. Lopez, IV

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the following persons pursuant to the Texas Rules of Appellate Procedure 9.5(b)(1) on this 18th day of May, 2018:

**VIA E-SERVICE**
Joseph L. Hood, Jr.
Windle Hood Alley Norton
Brittain & Jay, LLP
201 E. Main, Suite 1350
El Paso, Texas 79901
hood@windlehood.com

*/s/ Joe P. Lopez, IV*